## BUNEL v. O'DAY et al.

### (Circuit Court, W. D. Missouri, S. D. October 6, 1903.)

#### No. 179.

**1. COMPROMISE OF SUIT—VALIDITY.**

A compromise of suit between imputed brother and sister, where the question of legitimacy of the sister is involved, because of its scandalous character is such a proper subject of domestic adjustment as to invite the favor of the court. If free from fraud, no matter how unjust the defendant may have regarded the charge, or what different result subsequent developments might probably produce, it should stand. The value consists in the release from an uncertain position, with its anxieties, from apparent danger, and from inevitable expenses and trouble. Such compromises are especially favored by the courts when of the nature of family settlements.

**2. SAME—DUTY OF COUNSEL—EQUITABLE RELIEF.**

While it is the duty of counsel acting as guardian ad litem for a defendant to advise with and safeguard his client as far as he can in the matter of a compromise agreement, yet when such client, on the approach of her majority, without the connivance or concurrence of her counsel, separates herself from him, and enters into a compromise agreement with her adversary brother, neither law nor the ethics of the profession require that her counsel should go out and hunt her up and thrust his advice upon her; and where at the time of the consummation of the compromise agreement, when she had attained her majority, he admonishes her of the effect of her act, and she nevertheless enters into such agreement, she has no claims upon a court of equity to interfere.

**3. SAME—ADVERSARY COUNSEL.**

The adversary counsel has a right to advise and assist his client to the most advantageous compromise in his behalf, provided he neither makes, nor causes to be made, to the adverse party, any false statement of fact, with a view of inducing such compromise in reliance upon the truth of such statement. He has the right to deal with the adversary at arm's length.

**4. SAME—UNDUE INFLUENCE BY THE MOTHER.**

When one of the questions in suit is whether or not the defendant is the daughter of a former husband of the mother, the fact that the mother, both prior to and during the pendency of the litigation, may have stated to the daughter, in anger, that she was not born in lawful wedlock, and such imputation may have been among the inducements influencing the daughter to compromise the suit, such fact would not warrant the court in vacating the compromise without a judicial inquiry and ascertainment as to whether such imputation was true or false.

**5. IMPEACHMENT OF LEGITIMACY.**

The rule of law that when the marriage relation is once proven to exist nothing shall be allowed to impugn the legitimacy of the issue, short of proof of facts showing it to be impossible that the husband could be the father, is not a conclusive presumption, but is one that disappears when the truth appears. The proof to repel it is as to the degree.

**6. COMPROMISE—SUFFICIENCY OF MEMORANDUM CONTRACT—CONSTRUCTION.**

Where a part of the consideration to be paid by complainant for such compromise was the sum of $10,000, to be placed with a named trust company, the interest thereon to be paid to the defendant during her natural life, the fact that the written memorandum of such undertaking does not express the consideration therefor nor fix the time when such deposit should be made does not render it nonenforceable. The consideration can be shown by parol, and the law would imply that the deposit should be made in a reasonable time, according to the surrounding circumstances; besides, the cause being yet pending in a court of equity, the court has plenary power, as a condition to the recognition of the operation of the settlement, to require the deposit to be made in a given time; and where the beneficiary of such deposit, before a reasonable opportunity has been afforded the complainant to make such deposit, gives notice of the repudiation of the entire compromise agreement, she cannot complain that such deposit was not promptly made or could not be enforced.

**7. FOREIGN JUDGMENT—SUIT TO SET ASIDE—JOINDER OF THE HUSBAND.**

The fact that the husband is joined with the wife as a codefendant in a suit in equity to avoid the effect of the judgment of a foreign court, adjudging her to be equally entitled with the complainant to a share in a certain trust fund, and to recover from her and her curator the property, real and personal, obtained by them under such alleged fraudulent judgment, does not require that he should join her in a compromise agreement, or in an answer confessing the bill, as under the Missouri statute she is as to such property a feme sole, and as such can be sued alone, either at law or in equity.

**8. SAME—CROSS-BILL.**

Where, pursuant to the terms of such compromise agreement, the defendant wife conveys certain real estate to the complainant and other real estate to complainant's counsel in payment of his fees, the request of the defendants to file in the original suit a cross-bill bringing such counsel for the first time into the litigation, seeking to set aside such compromise and deeds as having been fraudulently obtained, is denied, as not being properly within the office of a cross-bill.

**9. ATTORNEY'S DUTIES.**

The conduct of lawyers and retainers thrusting themselves into litigious strife, by becoming largely interested in the result, animadverted upon by the court.

(Syllabus by the Court.

¶ 5. See Bastards, vol. 6, Cent. Dig. § 5.

¶ 6. Sufficiency of expression of consideration in memorandum within statute of frauds, see note to Choate v. Hoogstraat, 46 C. C. A. 183.

In Equity.

F. S. Heffernan, for complainant.

W. D. Tatlow and Allen & Rathbun, for defendants.

PHILIPS, District Judge. The complainant brought suit in equity in this court to avoid, for fraud and perjury in its procurement, a decree rendered by the Supreme Court of New York City, state of New York, in a suit brought at the relation of the New York Life Insurance & Trust Company (hereinafter for convenience called the trust company), by which it was adjudged that the defendant Mary was a legitimate child of one Charles Emile Bunel, deceased, father of complainant, and as such legitimate child was entitled to share equally with the complainant in a certain trust fund held by said trust company, created by the father of said Charles Emile Bunel for the benefit of said Charles and his heirs at law, the said Charles having died.

The bill of complaint charges that said Mary was in fact a child begotten in illicit intercourse between the mother of said child and one Alfred Earles, who has since married the mother of said child. The bill alleges that in October, 1884, in a suit instituted early in that year by said Charles Emile Bunel for divorce from the said mother, he was divorced from her on the ground of her illicit cohabitation with said Alfred Earles, resulting in the birth of said Mary, after trial of the issues of fact in said suit; that while complainant was a minor of tender years he was taken by his foreign guardian to France, in Europe; and that, when said trust company filed a bill in equity in said Supreme Court of New York City for the ascertainment and determination of who were the beneficiaries of said trust, certain named parties in southwestern Missouri, where said Charles Emile Bunel and his former wife had resided, organized a conspiracy for the purpose of having it made to appear that said Mary was the legitimate child and heir of said Charles Emile Bunel, and was therefore entitled to share in said trust fund, and to that end they confederated with the mother, Mrs. Earles, and with the counsel and guardian ad litem of the said complainant in said suit in the Supreme Court of New York City, and by false and perjured testimony, concocted and gotten up by the conspirators, deceived, mislead, and imposed upon the said court, whereby it was led into rendering the judgment declaring that the said Mary was the lawful heir of said Charles Emile Bunel, and entitled as such to an undivided equal part of said trust fund with the complainant; that under and by virtue of said judgment a large amount of money and property had passed into the hands of one John O'Day, as the curator and guardian of said Mary, then a minor of tender years, who was appointed such curator and guardian by the probate court of Greene county, Mo.

The supplemental bill of complaint charges that said John O'Day, as curator aforesaid, was guilty of waste and misappropriation to his own use of a large amount of property ostensibly belonging to his ward, for which he had not accounted; that, on the death of said John O'Day, his son, the defendant John O'Day, Jr., had been appointed by said probate court the successor as curator and guardian

125 F.—20

of said Mary, and that he as such curator and guardian had come into and yet holds the possession of a large amount of property, personal and real, so coming to said Mary as aforesaid. The bill seeks to have said Mary and said last-named guardian and curator enjoined from further availing themselves of said fund and property, and for an accounting with the curator, and for general relief.

During the pendency of this litigation, and after both the complainant and said Mary had attained their legal majority, to wit, on the 16th day of October, 1902, the complainant and said Mary reached a compromise agreement of said litigation, by which said Mary was to and did file her answer herein, under oath, admitting the material allegations of the bill. In consideration of said agreement of compromise the complainant conveyed to said Mary a life interest in 93 acres of land on the Boulevard near the city of Springfield, Mo., estimated to be of the value of $9,300, and the home that said Mary now lives in, in the city of Springfield, and an obligation on complainant's part to deposit for her use and benefit the sum of $10,000 in said trust company, the said Mary to draw semiannually the interest thereon during her natural life, and also assumed the payment of certain indebtednesses of the said Mary.

On the 12th day of November, 1902, she filed with the clerk of this court a motion, in the nature of a petition, for leave to withdraw her said answer, and for leave to file an answer, tendered with the motion, denying the allegations of the bill, and for leave to file a cross-bill, also tendered, against the complainant and his counsel, Mr. Heffernan, to set aside and vacate certain deeds made in execution of the terms of said compromise. It appears from the file-mark of the clerk that this answer and so-called cross-bill were filed with the clerk in vacation; but, as this was done without leave of court, these filings should be stricken therefrom by the clerk.

The said motion refers to the cross-bill, which charges, in effect, that said compromise agreement was procured by certain fraudulent deceptions and misrepresentations, referred to hereafter in this opinion. The court referred this matter to a special examiner, by consent of parties, to take the evidence bearing on these issues, and to report the same to the court, which has been done. This evidence is distressingly and unnecessarily voluminous. It contains a mass of irrelevant and incompetent matter, which would be unendurably burdensome on the court to point out in detail. The abstracts of the evidence furnished by the respective counsel were so partial, unintelligible, and unsatisfactory that, in justice to himself and the parties, the court took upon himself the labor of reading the nearly 700 typewritten pages covered by this evidence, which labor has consumed much of the court's summer vacation. The court cannot refrain from observing that one remedy for this growing evil in taking testimony in such cases would be to dispense with stenographers, and to require the lawyers to write out their multiplied and repetitious questions and answers, inculcating the useful lesson that expedition is a virtue in judicial inquiry.

1. The sole question for determination by the court is whether or not the answer filed by the defendant herein, and the compromise

agreement out of which it grew, were induced by reason of the imputed conduct of the complainant and others acting for and in concert with him, within the settled rule that the undue influence must be such "as amounts to overpersuasion, coercion, or force, destroying the will power." Tibbe et al. v. Kamp et al., 154 Mo. 545, 54 S. W. 879, 55 S. W. 440; Riggin et al. v. Board of Trustees of Westminster College et al., 160 Mo., loc. cit. 579, 61 S. W. 803; Wood v. Carpenter et al., 166 Mo., loc. cit. 481, 66 S. W. 172.

2. It is charged on behalf of the defendant that she was deceived by false statements made to her by her counsel and guardian ad litem, Judge Robertson. It is claimed that after this court, at the October term, 1902, overruled the demurrer interposed by the defendants to the bill of complaint, that accidentally meeting her on the street near the court building he informed her that the judge of the court had decided her case against her, and that she understood, as far as this court was concerned, the case had gone against her on the merits. Judge Robertson's testimony respecting this occurrence was that he simply informed her of the fact that the judge had overruled the demurrer; that in answer to her inquiry as to "What does that mean?" and "How does it leave it?" he informed her that it simply meant "that we have got a lawsuit on our hands, and we will have to go to work and take the evidence and try the case on its merits"; that while he was explaining to her and her husband, in effect, that they would have to prepare for trial, and could possibly get ready for it by the next April term of court, Henry Kee, her husband, said, "Well, by God, there was a shorter way than that to settle it;" that he asked him what he meant by the remark, to which he made no reply, and that he (Robertson) inferred therefrom that they were going to try to effect a compromise, and he then said to them, "If you are anticipating a compromise of this matter, don't compromise without letting me know anything about it, for I expect that I can get better terms on a compromise than you can;" that they drove away, and he saw no more of them until the day of the compromise. Little importance can be attached to the testimony of Henry Kee respecting this incident, for the reason that he places the interview as occurring after the compromise agreement had been effected, because he says they discussed the terms of the compromise, and he fails to corroborate the version of his wife. The court accepts Judge Robertson's version of this incident, because of the court's knowledge of him, and especially for the reason of the internal improbability of her story. Judge Robertson had pressed the demurrer with zeal and ability, and when it was overruled in open court, in the presence of the bar, the matter of the time for the filing of defendants' answers was discussed, and the order then made by the court overruling the demurrer granted leave to the complainant to amend his bill and to file a supplemental bill asking for injunctive relief, and granting leave to the defendants "to file answer herein on or before the 1st day of December, 1902, and that complainant reply thereto on or before the 15th day of December, 1902." It is utterly incredible that Judge Robertson should immediately thereafter, on meeting his client just outside of the court room, tell her that the court had decided the case on the

merits against her. Her assertion that the complainant afterwards told her the case had been decided against her by the court is contradicted by the complainant, and is unenforced by any other fact or circumstance in the case. That the action of the court in overruling the demurrer precipitated and influenced the completion of the compromise is probable and natural; and that the act of the complainant in urging a compromise, as he had a right to do, if he employed the adverse ruling of the court, was but argumentative, as the defendants then apparently stood confronted with a long, tedious, annoying, and expensive litigation. Few compromises of distasteful and distressing litigation would stand if the employment of such persuasive argument were held sufficient to avoid them.

3. Another contention of the defendants is the charge that Judge Robertson corruptly betrayed the interests of his client for a consideration of $1,000, to be paid by the complainant on the completion of the compromise; that, instead of loyally advising and counseling his client in the premises, he joined with the complainant and his counsel, Mr. Heffernan, in a scheme to deceive, to persuade the defendant Mary into the apparent amicable adjustment of the litigation. The evidence, to my mind, utterly fails to warrant this grave charge. The court finds, from the moral strength of the testimony, that prior to the action of the court in passing on the demurrer the matter of the compromise had been instituted between the complainant and Mary. It progressed without the knowledge, counsel, or concurrence of Judge Robertson. The defendant Mary did not even advise him of its pendency. His knowledge of the negotiations came to him from Mr. Heffernan; and when so advised thereof he protested to Mr. Heffernan against its terms, and asserted that she should have better terms. When he was finally advised by Mr. Heffernan that the compromise agreement had been reached between the parties, without his advice or concurrence, he held claims against the defendant Mary for moneys advanced by him from time to time to meet the urgent demands of herself and husband, amounting to about $400 or $500, in addition to his fees for professional services in defending the suit, and he insisted that he must be protected therein, and suggested that he thought, comparing his services with like services by other lawyers in like cases, that he ought to have at least a fee of $3,000. Mr. Heffernan then informed him that as part of the compromise agreement the complainant was to assume certain of Mary's indebtednesses, and that he was willing to assume the payment to Robertson of $1,000, but no more, against which Robertson again protested as insufficient, and asserted that he would hold his client for the balance. There is nothing of a tangible nature in the evidence to warrant any fair mind in finding that this $1,000 was in the nature of a bribe, to induce the acquiescence of Robertson in the settlement. He accompanied Heffernan, his client, and the notary public when they went out to the home of the Earles to execute the papers effecting the compromise agreement.

It is insisted by counsel for said Mary that it was the duty of Judge Robertson, when he learned of the pending compromise, to have sought out his client, and advised, counseled with, and safeguarded

her in the matter. The court does not understand that when a head-strong and wayward client does not go to the office of her attorney for counsel, but separates herself from him at a distance in the country, without notifying him or inviting his counsel, that the ethics of the legal profession demand that he should go and hunt her up, and thrust upon her, uninvited, his interference and counsel. That he should have accompanied the parties to the Earles home, in the country, when informed that the settlement was to be consummated, was reasonable and perfectly consistent with professional integrity. He was interested in protecting himself against loss of the money he had advanced Mary, in sole reliance upon her holding the property involved in the pending suit, as well as to look after the matter of his fees for professional services.

Mr. Heffernan, in conformity with information conveyed to him by his client of the terms of the settlement, had prepared and taken with him, out to the Earles home, the answer to be filed by Mary and the deeds conveying the real estate, as he understood the terms of the settlement to require. When the papers were handed to Mary to be read Judge Robertson asked her to go into an adjoining room with him, and his testimony is, and is credited by the court, that he asked her if she understood the purport and effect of the answer; that she was now of age; that if she made that answer she would thereby admit her bastardy, and that her acts would be binding on her, and she would give up all her interest in the estate as the heir of Charles Emile Bunel, etc.; to which she answered, in substance, that she had been in litigation since she was six or seven years old, and she was tired of it, and knew what she was doing or was satisfied with the arrangement. Law and ethics exacted nothing more of her counsel. She had agreed with her adversary without seeking Judge Robertson's advice or accepting his admonition.

The matter of Judge Robertson's fee was discussed in the open at this convention. On the refusal of the complainant to assume the payment of more than $1,000 thereof Robertson acquiesced, and the complainant then paid him $100 thereon, and stands bound for the remaining $900.

4. Further prejudice is sought to be excited against Judge Robertson by reason of the fact that he thereafter filed an answer to the bill on behalf of Henry Kee, without his knowledge or direction. After the answer, signed and sworn to by the defendant Mary, was delivered to Judge Robertson as their counsel of record, without more, he drew an answer on behalf of Henry Kee, which merely stated that the defendant did not desire to answer further in said cause than to say he was willing that the prayer of the bill be granted and decree rendered accordingly, and filed both answers on the same day. In the first place, as Judge Robertson assumed that the compromise made was understood by and agreeable to his clients, he further assumed that it was but in execution of the terms of the settlement that this formal answer should be filed by the other defendant. In the second place, under the statute of this state, the real estate and personal property in question was the separate property of the defendant Mary, and she held it as a feme sole, the personal property never hav-

ing been reduced to possession by the husband, Henry Kee. Section 4340, Rev. St. Mo. 1899. Under the same statute (section 4335) the wife, as to this property and this proceeding, was a feme sole, capable of transacting business on her own account, of contracting and being contracted with, "to sue and be sued, and to enforce and have enforced against her property such judgments as may be rendered for or against her, and may sue and be sued, at law or in equity, with or without her husband being joined as a party." Therefore, as to the suit in equity, Henry Kee was a mere figurehead—a nonessential. The answer of the defendant wife, in legal effect, eliminated him from the contest. As she was the sole party in interest, when she confessed the bill Judge Robertson, in recognition of the maxim that "the sprout savors of the root and goes the same way," assumed that Henry Kee followed his wife out of court.

5. In respect of the imputation cast in the so-called cross-bill upon the conduct of Mr. Heffernan in this transaction, it may be observed, in the first place, that all of the testimony intended to show the manner of his getting into the relation of counsel for complainant in this litigation, and what fee he was to receive, and what methods he may have sought to employ to win the suit, and the like, are entirely foreign to the issues on trial. The question here involved is, did he, in subserviency to his client, employ means in bringing about the compromise agreement such as a court of equity ought to denounce as deceptive and fraudulent, so as to entitle the defendant to have the original litigation reinstated and the statu quo re-established between the parties? As counsel for complainant, it was his right and duty to assist his client to any advantageous adjustment which a court of equity would not pronounce to be vicious. While the law would not permit him to deceive the adversary litigant by any representations as to fact or law known to him to be false, or regardless as to whether false or true, or to employ means designed or calculated to mislead or deceive her, with a view to obtaining an unreasonable and unfair advantage, yet as he was not her legal adviser, and she knew he was adversary in the litigation, he was under no obligation in law to consult her interests, or to disclose to her any information in his keeping as the confidential adviser of his client. He had a right to deal with the adversary at arm's length.

The evidence shows, to the satisfaction of the court, that Mr. Heffernan did not see or confer with the defendant Mary in person before the day of the consummation of the compromise agreement. He made no false statement or representation to her to influence the settlement. While it can well be inferred from the attending circumstances that he was advising with and kept informed by his client respecting the progress and details of the compromise negotiations between him and said Mary, I fail to find from the evidence that he advised or counseled his client or other person to make any false statements or give any false assurances to her. At the time and place of the consummation of the settlement he made no representation nor used any persuasion, so far as the evidence shows, to induce or overpersuade her to execute the deeds and the answer there presented. The whole of the transaction there was conducted in the open, in the

presence of the family and the parties. The evidence clearly enough shows that the answer and deeds were handed to her for examination, and that she looked over them and had opportunity to read them entire, and expressed herself as familiar with the contents and as satisfied therewith. She swore to the answer, and acknowledged before the notary public in due form that she was familiar with the contents of the deeds.

6. There was one conspicuous circumstance connected with the incidents of the transfer of the properties there made which persuades the conclusion that she not only understood what she was doing, but that she exercised her independent judgment. When one of the deeds from the complainant to her, conveying a certain piece of property, was given her to read, she looked over it, and at once said she did not want that property; that she was to have, or wanted in lieu thereof, the 93 acres of land on the Boulevard, near Springfield; and, after a controversial colloquy between her and the complainant respecting this matter, he finally acceded to her preference; whereupon Mr. Heffernan informed her that the 93-acre tract was subject to a mortgage of $5,000 or more, and therefore was not so valuable to her as the real estate expressed in the deed as it was prepared. Notwithstanding, she insisted on the change, and thereupon Mr. Heffernan, at the table, drew up the deed for the 93-acre tract of land. The sequel would justify the inference that she either possessed some inside information, or that she builded wiser than she knew; for the defendant John O'Day, Jr., in his deposition herein testified that that mortgage was held by his father, John O'Day, the former curator and guardian; but as a matter of fact it was a satisfied mortgage, which he retained as was his custom, although satisfied, and that it was never intended to be enforced against the property. So that this property was much more valuable than the piece complainant understood she was to have.

There is another circumstance connected with the incidents of that day's transactions confirmatory of defendant Mary's freedom of judgment. In discussing the matter of the $10,000 consideration, she suggested that she wanted that arranged just as in the case of a like fund the complainant was to settle on their common mother, which was to be placed by the complainant with the said trust company, the interest thereon to be paid her during her natural life, as it would secure to her a comfortable or certain income. This was accordingly so arranged.

After the papers were duly executed by the respective parties they separated in apparent peace and concord. The notary public took the deeds to town, and after appending the proper certificates of acknowledgment, with his seal of office, he delivered them to Mr. Heffernan, and the answer was then turned over to Judge Robertson, who, on the same day, filed it in the clerk's office. Mr. Heffernan filed for record in the recorder's office the deeds made to the complainant, and the deeds made by him to his mother for her home place, and the deed taken by Heffernan in satisfaction of, or as security for, his fees. The deeds to the defendant Mary, after their due

certification by the notary public, were turned over to Judge Robertson as her counsel for her use and benefit.

7. Mrs. Earles. It is charged by the promoters of this proceeding that the defendant's mother, Mrs. Earles, confederated with complainant to coerce this settlement. What did she do, as disclosed by the evidence, which the court should undo? Her testimony is that she in no way or manner employed any persuasion or influence on Mary to make this compromise. The utmost to be gathered from Mary's entire deposition is that her mother had at some time or another intimated or suggested to her that she was not the child and heir of Charles Emile Bunel. Conceding this statement to have been made by the mother, the evidence shows that it was not of recent date. Whatever may justly be said in reprobation of the conduct and character of this unfortunate and weak woman, Mrs. Earles, there are some circumstances connected with the relation between her and this daughter calculated to enforce the belief that there was a skeleton in the closet of her domestic life, which she disclosed to this daughter by suggestion long anterior to the institution of this litigation. This wayward girl, when she was only 15 years old, against the wishes of her mother, eloped with Henry Kee, himself a minor, to Oklahoma territory, where they were married. Crediting the unsupported testimony of the defendant, on their return home her incensed mother intimated to her that she was not the child of Charles Emile Bunel, and that she and her husband were thereby induced, as a peace offering, to convey to the mother the home where the mother and her husband, Alfred Earles, lived, the same place conveyed to the mother as a life estate by the complainant as a part of the compromise agreement. Mrs. Earles made oath to the bill of complaint herein, in which said illegitimacy of Mary is charged. Therefore, if it be conceded that Mrs. Earles repeated this information to the daughter, and advised the settlement, can that fact suffice to annul the compromise? Certainly not, unless the court is to assume that the fact claimed to have been stated by Mrs. Earles was false, and made by her for the purpose of coercing the settlement. How can the court say it was a false statement in advance of the judicial inquiry and ascertainment which is the substratum of the bill of complaint? The groundwork of the petition for divorce between Charles Emile Bunel and the mother of the defendant Mary was the charge of adultery with Alfred Earles, the fruit of which was the defendant Mary. This issue was found for the husband, and it was adjudged by the court that the allegation was true. With knowledge of the fact, which Mary claims was communicated to her by her mother just after her marriage, and prior to the institution of the present suit or any negotiations respecting a compromise, that her mother conceded her illegitimacy, and that, therefore, a great wrong had been perpetrated upon the legitimate infant child while in France, how can it be found by the court that the reassertion of the charge by the mother pending the negotiations for a settlement, if it be conceded, should vitiate the compromise? The very attitude of the mother, as disclosed by the bill of complaint, should rather be held to have well warranted the defend-

ant in avoiding the possible result of the suit, which might, if successful, leave the defendant Mary penniless.

8. There is no foundation in truth for the charge that the defendant Mary was inveigled from her home in Springfield out to the house of the Earles, the better to influence her in the matter of the compromise. The evidence shows that Mary had been ill with fever at her home in Springfield for some time. Aside from Mrs. Earles' testimony, the defendant's own sworn statement, as detailed by her unassisted lips to her attorney in a petition filed by her for divorce from her husband, just after the consummation of the compromise, showed that Mary was alone in this illness, shamefully neglected by the indifference of her husband, who the evidence clearly shows to have been a mere proletary—a shiftless pensioner upon this inheritance of his wife; and that Mrs. Earles, no matter what may have been her past sins, yet had left within her breast a burning spark of motherhood, which took her to the bedside of her sick child, where she kindly and assiduously ministered to her needs, while the husband indulged his passion for vagabondism. As soon as Mary was able to be moved, with her approval, she was taken to her mother's home for recuperation. The negotiations for a compromise of the suit had been conducted between her and the complainant evidently to a tangible understanding prior to this illness, awaiting the attainment of her legal majority for its consummation.

9. The Divorce Suits. It is claimed for Mary that as a part of the scheme to get her more completely under the influence of the Earles, and the control of her property, she was overpersuaded by them and others in the scheme to institute divorce proceedings against her husband. The records show that during her short married life, of about three years, she had brought three separate actions for divorce. As two of them were anterior to the negotiations for a compromise, it cannot be maintained that they had any effective connection therewith. The burden of proof in this as throughout the present controversy rests upon the defendant. She is not corroborated in this assertion by a single witness or attendant circumstance. The attorneys who brought the last two of these suits testified that in person she detailed to them the inculpatory facts alleged in the petition. Not only this, but the specifications of ill treatment, neglect, and general worthlessness charged against the husband bear internal evidence of having proceeded unaided from the mind of the wife. They disclose, with particularity, acts of meanness and ill usage on the part of the husband, occurring in the inner circle of their domestic life, which persuasively indicate that they must have come alone from the wife. She did not possess imagination enough to invent these details, and it would be remarkable that she could retell them by mere rehearsal inspired by another mind. All these petitions were sworn to by her in the explicit and solemn form prescribed by the statute, as follows: "This affiant makes oath and says that the facts stated in the above petition are true according to the best knowledge and belief of the plaintiff, and that the complaint is not made out of levity or by collusion, fear or restraint, between the plaintiff and defendant, for the mere purpose of being separated from each other, but in sincerity

and truth, for the causes mentioned in the petition." Does she regard such oaths as mere "wafer cakes"? If so, what respect can this court have for her testimony in this case? After solemnly swearing to such serious charges against her husband, that she could go back to his bed rather evidences a lack of moral sense on her part, and the overruling power and influence of the husband over her. It can very well be understood why the husband, Henry Kee, should take her back and hold her, as he was a mere pensioner upon her income. The uncontradicted evidence is that when the last petition was drawn, after she was of legal age, she was distinctly advised by her counsel that the former grievances complained of had been condoned by her subsequent cohabitation with her husband; whereupon she detailed to her attorney the other acts of outrage upon her by her husband, recently committed, and protested that she would never again return to him as she had done heretofore. The compromise had then been consummated, and she was under no coercion. The testimony of Judge Robertson is that there had been mutual criminations and recriminations between this couple. Within a short time prior to said October term of this court, 1902, the husband had charged her with acts of infidelity—undue intimacy with other men. Yet within three days after the last suit for divorce was filed she and her husband were found in the hands of the defendant O'Day, as hereinafter detailed, and the divorce suit was again discontinued. What regard can the court have for her uncorroborated statements?

10. I am persuaded from the evidence in this case that the present controversy would never have come to plague this court and the public had the defendant John O'Day, Jr., not interposed, inspired, and fostered this further litigation. As the testimony discloses, serious charges were preferred against the first curator, the father of the defendant John O'Day, Jr., for malversation in office as curator—of having committed waste and misappropriation of the proceeds of the property belonging to his ward, for which an accounting had been demanded. As soon as the compromise settlement came to his ears, the defendant O'Day conveniently met Mary Kee and her husband, and, after suggesting to them his conception that they had fared badly in the settlement, he conducted them to a lawyer of his choosing, who is conducting this contest on behalf of the defendants. The mailed hand of O'Day at once appears in the contest on the 20th day of October, 1902, when the Kees were conducted to his attorney, and a hard and fast contract was drawn up by O'Day's attorney and executed by the defendants, releasing and acquitting, with repetitious particularity and most comprehensive legal terminology, the O'Days from any and all claims and demands, of whatsoever character, on account of the curatorship of John O'Day, Sr. The consideration expressed therefor was the sum of $900, to be paid to the said Mary in monthly installments of $75 each. The following excerpt from the cross-examination of John O'Day, Jr., is significant: "Finally she [meaning Mary] came over and her husband came afterwards—no, I believe they came together—and we made arrangements where I was to let her have nine hundred dollars, or enough money to prosecute this case. * * * She talked about an attorney, and asked

me about Mr. Allen, and I told her that Mr. Allen was a very good attorney, and could be depended on—what he said. She said that she had had so much dealing with corrupt lawyers she was a little 'leary.' I told them they need not be afraid of Mr. Allen, and so I took Mr. Allen over that evening, and that is when these contracts were made—that evening or the next evening after that these contracts were drawn up."

11. In passing, it is not impertinent to say that it comes with little grace of consistency for the defendants to suggest in argument that the complainant obtained an unconscionable advantage over the defendant Mary in the settlement, in obtaining an assignment of any claim she had against her curator for waste and misappropriation, when this contract of release obtained by John O'Day, Jr., shows that he estimated the matter at $900, doled out in payments of $75 per month, and to aid in maintaining further contests between the complainant and Mary. The evidence also shows that on the day he met with the Kees he furnished them with money, and as soon as he got the contract drawn up for the release of his father's estate, and he knew the lawyers had also obtained a written contract from her by which they were to receive one-third of all that was recovered in this proceeding, he spirited Mary and her husband away in a closed carriage, at the hour of midnight, and sent them to another county, and tried to deceive the complainant's counsel as to their whereabouts. The money to support the present litigation has been furnished by the defendant O'Day. When the court read this branch of the evidence respecting the execution of said two written contracts, one in favor of O'Day and the other of the lawyer, two thoughts occurred: One was with what little consistency can the defendant's counsel claim, as they do in the tendered cross-bill, that when the defendant Mary executed the compromise agreement and the answer she was so debilitated and weak in body and mind that she was incompetent to make such agreement, while within three days thereafter they had her execute the important and extremely technical contracts which were to absolve John O'Day, Sr.'s, estate from liability for his curatorship, and to pass one-third of the estate which might be recovered in the litigation to the lawyer. The other reflection was, how much shall it profit the defendant Mary in the end should this motion be sustained?

12. No professional mind can read the examination of the defendant Mary by her counsel without the impression that she was testifying rather on a theory constructed for her than on facts known to her. The questions were most leading and suggestive, and after a fashion made the testimony more that of the questioner than the party interrogated. When on cross-examination she was carried out of this theoretical field she frankly stated that the terms of the settlement were satisfactory to her if the $10,000 had been paid. The evidence shows clearly enough that her dissatisfaction with the arrangement respecting this $10,000 originated after the settlement, and was produced solely by the suggestions of the parties who got into this case in the interest of the O'Days. When questioned respecting this matter, she said that the complainant had never made her a promise

he did not fulfill, except the one respecting this $10,000; that the memorandum did not say when it was to be paid; whereupon the following questions and answers were made: "Q. Did you have any idea that he was not going to do that right off? A. I didn't at the time until I came to town. Q. Who told you? A. Several different ones—Mr. Allen told me for one. * * * He said it didn't say when he was going to do it." The evidence also shows that the arrangement respecting this $10,000, as expressed in the memorandum, was discussed by and with the defendant Mary at the time the memorandum was so drawn. Judge Robertson testified that he distinctly advised her that she would not be able to check on this $10,000 fund at will, and that she could only draw the income, and that it was said in the course of the conversation that her husband could not get hold of it to squander it, and she said that she understood it, and was satisfied to have it fixed that way, just as the like arrangement for $10,000 for the benefit of her mother. The written memorandum is in words and figures as follows:

"October 16, 1902.

"I give to my half-sister, Mary Earles Kee, the use of ten thousand dollars for and during her natural life, the money to be deposited with the New York Life Insurance & Trust Company of New York City. She is to draw the interest on same during her natural life.
"[Signed]                                    H. Bunel."

As the memorandum does not express any consideration therefor, it is perfectly competent to show by parol what the consideration was; and, likewise, as the contract on its face does not purport to express the whole contract, that can be supplied by parol. The very circumstances under which this memorandum contract was given are such that the law itself would imply that the money should be deposited with the trust company in a reasonable time. It does not lie in the mouth of the defendant Mary to complain that this money was not deposited. Before the complainant, under the circumstances, had a reasonable time in which to go to New York and make such deposit, within three days of the completion of the compromise agreement, she repudiated the whole transaction, and employed counsel to avoid and set it aside, thereby notifying the complainant that she would not accept this money. How can she then complain that it was not deposited? One cannot complain that a tender was not made after notifying the obligor that he will not accept. Under such conditions, the law would not exact that the complainant should have made the deposit of $10,000 with the trust company, in fulfillment of the provisions of the contract when he would lose the benefit of the use thereof, while the defendant was litigating with him, as the trust instrument would have required that the interest thereon should be paid to Mary.

Moreover, the parties are in a court of equity, and the court has jurisdiction both of the parties and the subject-matter; and in the exercise of its plenary power for administering exact justice it can and will protect the defendant against any possible loss respecting this $10,000, by requiring the complainant, within a specified time, after the defendant Mary shall have filed with the clerk of this court her written notice of her willingness to accept the settlement, to deposit

said fund with the trust company. The court will retain jurisdiction of this controversy until such indemnity is given or said sum is so deposited. This is all that the defendant can in conscience exact.

13. It is suggested in argument by counsel for the defendant that the bill of complaint does not state a cause of action on its face, for the reason that it discloses the fact that during the period of gestation, prior to the divorce between Charles Emile Bunel and his then wife, he had the means of access to her, and the law presumes the legitimacy of Mary. Without stopping to discuss the legal effect of such fact on the compromise, it is sufficient to say that the bill does not disclose a state of facts on which the presumption of legitimacy arises. The rule of law, founded on the public policy, of maintaining the integrity and sanctity of the domestic relation, is that, when the marriage relation is once proven to exist, "nothing shall be allowed to impugn the legitimacy of the issue short of the proof of facts showing it to be impossible that the husband could be the father." Patterson v. Gaines et ux., 6 How. 550, 588, 12 L. Ed. 553. This rule is expressed by Judge Sanborn in Adger et al. v. Ackerman et al., 52 C. C. A. 577, 115 Fed. 133, as follows: "Once a marriage is proved, nothing can impugn the legitimacy of the issue short of proof of facts which show it to have been impossible that the husband could have been the father." The bill, as already shown, not only alleges that on a trial of the issue joined between Charles Emile Bunel and his then wife it was alleged, proved, and adjudged by the court that the defendant Mary was the offspring of an adulterous intercourse between the wife and Alfred Earles, but it is also alleged that said allegation is true, and that when said Mary was begotten the evidence would show that Charles Emile Bunel was impotent—physically incapable of an act of procreation—and that from and after September, 1883, the period within which said child could have been begotten in lawful wedlock, the husband was away from the wife, living several miles from her, and that he did not at any time thereafter have access to her person. As the presumption in question is not a conclusive presumption, it is one that would disappear when the truth appeared. The rule of law only imposes upon the party impeaching the legitimacy the burden of establishing the impossibility of procreative intercourse. No matter, therefore, what the proximity of the husband to the wife, if in fact he was impotent the presumption of his paternity would fall. Equally so, no matter what the possible means of access were, it would be competent for him to show by indubitable evidence that as a matter of fact he had no intercourse with her. In other words, it would be simply a question for the court as to the degree of such proof, within the rule, to satisfactorily overcome the presumption of legitimacy. Whether or not the testimony of the physician referred to in the bill of complaint as to the fact of impotency would be reliable cannot affect the averment of the bill. Although "a country doctor," as contemptuously described in counsel's brief, he might be as good a judge of the instrumentalities of procreation as the city doctor.

14. It is a wholesome rule of law, equally founded in sound public policy, that an amicable compromise of a litigation of the character

of this should be favored by the courts. No matter if, on further investigation or subsequent development, it should appear that the defendant knew at the time that the demand was not well founded in law or in fact, it would not affect the validity of the compromise. If fairly obtained, it should stand. "The value consists in the release from an uncertain position, with its anxieties, from apparent danger, and from inevitable expenses and trouble." Bishop on Contracts (1887) § 57; Parker v. Enslow, 102 Ill. 272, 40 Am. Rep. 588; Flannagan v. Kilcome, 58 N. H. 443; Little v. Allen, 56 Tex. 133; Allen v. Bucknam, 75 Me. 352; Wehrum v. Kuhn, 61 N. Y. 623; Troy v. Bland, 58 Ala. 197; Jones v. Rittenhouse, 87 Ind. 348.

This rule is especially applicable to family agreements and settlements, which is expressed as follows in 12 Am. & Eng. Enc. of Law (2d Ed.) p. 875:

"Family agreements and settlements are treated with especial favor by the courts of equity, and equities administered in regard to them which are not applied to agreements generally, and this on the ground that the honor and peace of families make it just and proper to do so. Accordingly, it has been laid down as a general rule that a family agreement entered into upon the supposition of a right, or of a doubtful right, though it afterwards turns out that the right was on the other side, shall be binding, and the right shall not prevail against the agreement of the parties."

And the general rule is that the court will not inquire into the adequacy or inadequacy of the consideration, for the reason that it is enough to support the agreement that there was a doubtful question and the compromise was deliberately made. Smith v. Smith, 36 Ga. 191, 91 Am. Rep. 761; Owen v. Hancock, 1 Head, 573; Bellows v. Sowles, 55 Vt. 391, 45 Am. Rep. 291; Naylor v. Winch, 1 Sim. & S. 555. Had this compromise settlement been consummated during the minority of the defendant Mary, it would have been the duty of the court to carefully scrutinize it and sedulously guard and protect her interests; and even though it was not consummated until after her legal majority, and she was sui juris, it would be the duty of the chancellor to see that it was free from fraud and intended imposition.

15. While the court may not, as it should not, shirk from any duty, however burdensome or unpleasant, in administering justice and right between the parties, no matter how reprehensible their conduct and character may be, yet no judicial eye can scan this record without discerning the low state of morals of the two principal contestants, and applauding, at least, their judgment in putting an end to the strife by adjustment out of court. And this court cannot refrain from giving expression to the conviction, deepened by the exhibitions of prodigality and depravity of the contending parties, that often no greater misfortune can befall children than great riches cast upon them by gifts and inheritance. The intended beneficence of the father of Charles Emile Bunel in creating the trust estate in question has proven but a curse to the beneficiaries. Neither of these children, as their testimony shows, submitted to the labor of acquiring an education. They seem to have spurned the honors and dignities which come from labor. The boy has been content to be a mere parasite, to exist in idleness, and rot out in wantonness and riot;

while the girl, aspiring to a share in the bounty of the trust, has grown up with a roving fancy and unstable habits, illiterate and wayward, contemning parental authority and respect, eloping when a mere child and marrying a mere boy, who, in thoughtlessness, has eaten only the bread provided through the wife's access to the claimed inherit- ance. And in this case this condition of affairs is aggravated by its demoralizing effect upon lawyers and hungry retainers, who became so largely interested in the spoils of the controversy that their per- sonality is thrust conspicuously into the case. As to the O'Days, while charging Heffernan with getting on two sides of the contro- versy, as respects them the evidence presents the spectacle of the brother of the defendant O'Day standing in with Heffernan and claim- ing a share of his large fee as counsel for the complainant, while aid- ing by his testimony the interests of his father's estate, of which he is a beneficiary heir, by trying to aid his brother in the attempt to upset the compromise settlement. And after the disclosure of the contract obtained by the defendant O'Day from the Kees, by which he ob- tained the release of his father's estate from accountability for the alleged devastavit and misappropriation of the ward's estate, he essays in his deposition to palliate his situation by saying he is nevertheless now willing to account to the ward for any wrong of his father's; while Mr. Heffernan, in his deposition, concedes that he overgrabbed in the amount of property he obtained from his client for his fee, and expresses a willingness to make restitution.

16. The cross-bill proposed to be filed herein by the defendants Mary and Henry Kee makes F. S. Heffernan a party thereto, for the reason that the deeds executed in pursuance of the agreement in part placed the title to some real estate in him. A cross-bill is in the na- ture of a defense, and can only be filed between parties to the original suit. It cannot bring in new parties into the controversy. "The original bill and cross-bill are but one cause. It must be confined to the subject-matter of the original bill, and cannot introduce new and distinct matters not embraced in the original suit. * * * A cross- bill to make new parties is not only improper and irregular, but wholly unnecessary." See Thruston v. Big Stone Gap Imp. Co. (C. C.) 86 Fed. 485; Goff v. Kelly (C. C.) 74 Fed. 327; Lautz v. Gordon (C. C.) 28 Fed. 264; Johnson S. R. Co. v. Union S. & S. Co. (C. C.) 43 Fed. 331; Stonemetz P. M. Co. v. Brown, etc. (C. C.) 46 Fed. 851. The cross-bill, therefore, tendered by the defendants is wholly inad- missible.

The court will form the order of entry hereon requiring the deposit to be made by the complainant of the $10,000 within a specified time after the defendant Mary shall have signified her willingness to accept the same, whereupon the compromise settlement shall stand; the court retaining jurisdiction for such further order, etc., as shall be proper and essential to the ends of justice.