irection.' Gemsco v. Walling (1945), 324 U. S., 244, 260, 65 S. Ct., 605, 14, 89 L. Ed., 921."

The language of 56 Statutes at Large 781 appears to be "unambiguous, direct, clear," and we are of the opinion that the plain words and meaning of the statute are not overcome by the legislative history relied upon by defendant and contained chiefly in Senate Report No. 1592 of the Seventy-seventh Congress, Second Session, and Senate Report No. 422 of the Seventy-ninth Congress, First Sessions. These are the reports that accompanied S 2731 and S 937 which became 56 Statutes at Large 781 and 59 Statutes at Large 306.

The motion of plaintiff for an order striking from the answer specifications one and two is, therefore, sustained.

An order is drawn accordingly.

**STATE, ex rel. STEIGER, Complainant, v. GRAY, Defendant.**

Juvenile Court, Cuyahoga County.

No. 171915.   Decided September 9, 1957.

394

Albert B. Lefton, John F. Choffey, Cleveland, for complainant.
Seymour Gross, Cleveland, for defendant.

## OPINION

By WOLDMAN, J.

Complainant, an unmarried woman, filed a complaint in bastardy alleging that the defendant is the father of her child born to her December 1, 1956.

Defendant entered a plea of not guilty and filed a motion for a blood test of the child. This motion was granted, and Dr. Roger W. Marsters, a clinical pathologist with extensive experience involving blood group tests, and the use of blood tests for disputed paternity, was selected by this court to conduct the blood grouping tests of the defendant, complainant and her child.

The parties waived a jury trial and at the hearing before this court, the complainant testified that she had engaged in sexual relations with the defendant during the period March 9 to June 15, 1956, and that the child was begotten in March, 1956, as a result of said relations. Complainant further testified that she had not engaged in sexual relations with any other man during said period; that the defendant was the father of the child; that he visited her in the hospital during her confinement "to see his baby;" and that he had promised to marry her after obtaining a divorce from his wife.

Complainant's mother testified concerning defendant keeping company with her daughter, and that after complainant became pregnant defendant told the mother that he would pay complainant's expenses. She also corroborated complainant's testimony that defendant visited the complainant and child at the hospital.

The child, a baby girl, was exhibited to the court for the purpose of calling attention to alleged physical resemblance to the defendant, the reputed father.

At the very outset of the hearing, complainant's counsel called defendant for cross-examination. Defendant personally objected on constitutional grounds that such cross-examination would tend to disgrace or incriminate him. His objection was sustained.

Art. I, Sec. 10. Ohio Constitution, in part provides:

"No person shall be compelled, in any criminal case. to be a witness against himself; but this failure to testify may be considered by the court and jury and may be made the subject of comment by counsel."

42 O. Jur. 48;

"The privilege of a witness not to give self-incriminating evidence is not limited merely to criminal prosecutions wherein the witness is the defendant but can be invoked in any judicial proceeding. Thus the defendant in bastardy proceedings (quasi criminal action) may not be called upon to testify against his wishes." **Simons v. Kiser, 46 O. O. 11 (1950); Schneider v. State, 33 Oh Ap 125,** 168 N. E. 568.

Defendant himself did not testify on his own behalf. He called but one defense witness—Dr. Roger W. Marsters, a clinical pathologist, who had been appointed by the court to conduct the blood grouping tests of the child, the complainant and the defendant, as requested by the defendant. Dr. Marsters is a doctor specializing in blood groups. He is head of clinical chemistry at Cleveland City Hospital and in charge of the blood bank. He is also assistant professor of bio-chemistry in the Department of Pathology at Western Reserve University School of Medicine and author of published learned papers on the subject of "Determination of Non-Paternity by Blood Groups."

Dr. Marsters' qualifications as an expert serologist were not questioned by the complainant. He testified that he carefully tested the blood specimens of the complainant, the defendant and the child "for the International OAB, M and N, and C, D, E, and c blood factors by using known blood controls along with the unknowns." Following are the results of these tests:

| | Int. | M | N | C | D | E | c |
|---|---|---|---|---|---|---|---|
| "Hope A. Steiger | A | Neg. | Pos. | Neg. | Neg. | Neg. | Pos. |
| Bruce Gray | O | Pos. | Pos. | Neg. | Pos. | Pos. | Pos. |
| Baby Norma Steiger | A | Neg. | Pos. | Pos. | Pos.* | Neg. | Pos. |

*Weak Rh positive

"The data on the International OAB blood group factors are inconclusive because the mating of a type A individual with a type O individual may produce offspring of either type A or type O.

"The data on the M-N factors are inconclusive, because the mating of a type N individual with a type MN individual may produce offspring of either type N or type MN.

"The data on the Rh blood factor D are inconclusive, because the mating of a D-positive individual with a D-negative individual may produce offspring of either D-positive or D-negative reaction.

"The data on the Rh blood factor E are inconclusive, because the mating of an E-positive individual with an E-negative individual may produce offspring of either E-positive or E-negative reaction.

"The data on the Hr factor c are inconclusive because all three blood specimens gave identical reactions with each other being c-positive.

"The data on the Rh factor C however indicate that an exclusion of paternity is established on this basis. Both Hope Steiger and Bruce Gray are negative for the C factor and therefore lack this particular blood antigen. On the other hand Baby Norma June Steiger is C-positive and therefore possesses this particular blood antigen. Since these blood factors can only be inherited from the parents and since both of these adults lack the C, then some other man than Bruce Gray must be the father of this child.

"In conclusion, an exclusion of paternity is established by the demonstration of the C factor in this child, Norma Steiger, without the presence of this particular blood factor in the blood of either of these two adults, Hope Steiger or Bruce Gray.

Respectfully submitted,
Roger W. Marsters, Ph.D.
Clinical Pathologist."

Dr. Marsters stated that he and his associates made five separate blood tests and that all proper safeguards were taken to protect the integrity and accuracy of the blood grouping tests. The accuracy of his conclusion of the exclusion of defendant as the father of the child was not rebutted by any counter medical evidence submitted by complainant. Nor was there any question raised as to the reliability or efficacy of determining non-paternity by blood testing.

The burden of proof was upon the complainant to make out her complaint and charge by a preponderance of the evidence.

These are the factors preponderating in favor of the complainant: her own and her mother's unrebutted testimony; the child being exhibited to the court for the purpose of showing physical resemblance to defendant; refusal of defendant to submit to cross-examination on constitutional grounds; and his failure to testify on his own behalf.

Giving full weight to all these factors, has the complainant succeeded in proving the guilt of the defendant by a preponderance of the evidence—notwithstanding the testimony of the expert serologist that the blood grouping tests establish the exclusion of the defendant as the father of the child?

"Preponderance of the evidence is not determined by the number of the witnesses on either side but by the impression which their testimony makes upon the jury . . . and the character of the testimony itself." **Rice v. City of Cleveland, 144 Oh St 299.**

In other words, what weight is the court warranted in giving to the uncontradicted scientific testimony of the blood group expert which unequivocally excludes defendant as the father? Or stated in another way—should a court permit a man to be adjudged the father when the blood tests exclude paternity by the immutable law of genetics?

This case presents a clear conflict between evidence adduced from lay persons and the conclusion of science adduced from the immutable law of genetics.

Some states (California, Michigan, New Hampshire and Oregon among them), have enacted statutes which make blood test exclusions decisive of the issue.

However, the existing Ohio statute (§3111.16 R. C.) does not make the result of blood grouping tests establishing an exclusion of paternity, conclusive.

**Sec. 3111.16 R. C.,** in part provides:

"Whenever it is relevant to the defense in a bastardy proceeding, the trial court on motion of the defendant, shall order that the complainant, her child and the defendant submit to one or more blood grouping

sts to determine whether by the use of such tests, the defendant can e determined not to be the father of the child. The tests shall be made y qualified physicians. In cases where exclusion is established the results of the tests together with the finding of the expert of the fact of on-paternity shall be receivable in evidence."

Since no evidence is by law made conclusive or unanswerable unless o declared by statute, weight must be given to the Ohio legislature's ailure to provide for conclusiveness in enacting the above statute in 939.

The Ohio rule has been stated in the case of **ex rel. Walker v. Clark, 144 Oh St 305, 58 N. E. 2d 773 (1944)** as follows:

"The findings and result of such grouping test admitted in evidence re not conclusive of non-paternity, but may be considered for whatever weight they may have in proving that fact." (See also: **State, ex rel. Slovak v. Holod, 63 Oh Ap 16; State v. Wright, 59 Oh Ap 191 1938; State, ex rel. Freeman v. Morris, 156 Oh St 333 [1951].**)

It appears then that when scientific testimony regarding results of blood grouping tests, and the testimony of lay persons as to facts conflict, as they do in this case, the jury or the trial court must determine the relative weight of both types of evidence—the law having made no distinction between such expert evidence and any other kind of expert testimony.

The QUESTION arises: What weight and value shall the court give to such blood grouping test evidence submitted by a qualified expert?

It is apparent that the testimony adduced from the parties and other lay persons in bastardy proceedings, by its very nature, may be susceptible to doubt and question. It is usually self-serving. The alleged intercourse between the woman and the putative father is almost always carried on clandestinely and secretly. Seldom if ever is there any reliable corroborating eye-witness testimony. Circumstantial evidence must be relied upon to a great extent. In other words, such testimony in such cases may be as reliable or as unreliable as the persons giving it.

As stated in Jordan v. Mace, 144 Me. 351, 69 A. 2d 670 (1949):

"By the very nature of such a case evidence excluding the possibility of opportunity for another to be the father is limited to the statement of the complainant. No corroboration of total lack of opportunity could well be expected on the part of the respondent. Chance alone would produce evidence tending to show acts of intercourse by another with the complainant within the limited period."

On the other hand an exclusion of paternity based on the blood groups represents a finding of a rather exact science and is not simply testimony of a lay witness or even the opinion of an expert. Blood grouping test results are governed by the immutability of the scientific law of blood grouping.

Blood grouping tests have been called "the fingerprints of blood"— and to a degree this is correct.

Such tests, conducted for the purpose of determining non-paternity, are based upon the scientific principle that the type of blood of a child is inherited from a combination of blood groups in the blood of its parents.

Should the blood groups of the child in question not correspond to the parental combinations of blood groups, the accused man could not possibly be the father of that child.

Thus, if a factor is present in the blood of the child and is absent in the blood of the mother, said factor should be found in the blood of the man who is the child's true father. However, if the blood of the accused man charged with being the father, lacks that factor, that lack excludes him as the true father.

Or specifically applied to the instant case, there being a positive C factor in the blood of the child, that blood factor must have been inherited from either the father or mother or both. Since the mother's blood lacks the C factor, the child must necessarily have inherited that factor from its father. But inasmuch as the defendant in this case also lacks the C factor, it follows as a matter of scientific certainty that some man other than the defendant fathered this child, and the defendant must be excluded as the parent.

This operation of blood tests to prove non-paternity may be reduced to this simple homely illustration:

If an apple is found under an apple tree the natural inference is that it came from that or some other apple tree.

However, if a pear is found under an apple tree, it is clear under the laws of nature that some other tree with pear-producing factors, produced that pear, and the apple tree under which the pear was found must definitely be excluded as the parent-tree.

At present, practical application of blood grouping in bastardy cases is restricted to ruling out paternity, rather than attempting to establish it. Applying this principle, it is apparent that the apple could have come from any apple tree. Therefore, it is difficult and unsafe to establish which is the parent apple tree. It could have been one of several. But it is comparatively simple to exclude the apple tree as the parent of the pear found under it. Accordingly we must look for a tree with pear-producing factors as the parent tree.

Great advances have been made in this science since 1939 when the Ohio law was enacted. In 1939, only two blood group systems were known. Since then at least seven additional and separate blood grouping systems have been discovered to supplement the earlier knowledge, and their inheritant patterns have reached the point of reliability that there can hardly be any question about them. These advances have resulted in more and more courts in states with statutes similar to Ohio's recognizing the virtual infallibility of properly conducted blood grouping tests which exclude paternity. Increasingly courts are giving judicial recognition to the reliability and accuracy of such tests.

Thus, the Supreme Court of Maine in the case of Jordan v. Mace, supra, held:

"Exclusion of paternity by blood grouping tests under biological law is scientific proof that a respondent is not the father."

And the highest court of Maryland has taken judicial notice that such tests are scientifically accurate. Shank v. State, 185 Md. 437, 45 A. 2d 85 (1945).

In a recent exhaustive and well annotated article on the subject of blood tests in 46 A. L. R. 2d 1,000, at page 1028, the general rule as to the conclusiveness of blood tests is stated as follows:

"The courts, in answering the question of the conclusiveness of blood grouping tests the results of which established non-paternity, have indicated considerable disharmony of opinion. Of the divergent views which have been taken the best reasoned one would seem to be this: blood grouping tests which establish non-paternity are conclusive on the issue of non-paternity except where the evidence is such as to support a jury finding that because of a defect in testing methods employed in a particular case (or because of a failure to show that the tests were accurately conducted), the results of the test could not be accepted as accurately reflecting the operation of the immutable laws of genetics."

It is significant that the courts of the state of New York whose blood-grouping test statute is substantially the same as that of Ohio, have consistently followed the above general rule, as evidenced by the following decisions: In Clark v. Rysedorph, 118 N. Y. 2d 103 (1952), the court states that blood grouping test evidence excluding paternity, and which was uncontradicted, was conclusive as to non-paternity, since to reject such testimony would be to ignore scientific facts. Houston v. Houston, 199 Misc. 469, 99 N. Y. S. 2d 199 (1950), held that where exclusion of paternity is definitely established by blood grouping tests, the finding of non-paternity is binding upon the jury unless it finds that the tests have not been properly made. Gilpin v. Gilpin, 197 Misc. 319, 94 N. Y. S. 2d 708 (1950), ruled that where it is shown that proper safeguards were drawn around the testing procedure, positive results of blood tests excluding paternity are final on the question of paternity.

Of course, the infallibility of the results of blood grouping tests may depend upon the skill employed in making them and may be subject to errors resulting from the lack of training of the serologist, the use of commercial sera, the failure to make proper counter tests, et cetera.

But where it is shown that the person making the tests is qualified, that proper safeguards were drawn around the testing procedure, and that no discrepancies were found in the testing methods (as was the situation in the instant case), a court is warranted in taking judicial notice of the correctness of such tests. Consideration must then be given to the question whether positive results of such blood tests excluding paternity should not be accorded the full weight to what these scientific tests appear to prove, namely, the exclusion of paternity.

"If the jury might disregard the fact of non-paternity when it was shown clearly by men trained or skilled in science the purpose and intent of the legislature that the light of science be brought to bear in a case such as this are given no practical effect." Jordan v. Mace, supra.

It is apparent that in Ohio, legislative law has moved more slowly than scientific research in giving full weight to blood grouping tests which definitely exclude paternity.

But this court cannot close its mind to the great advances in the science of blood grouping tests since 1939, and to the modern recognition

by medico-legal resources of the high value of such blood tests as a wholesome aid in a quest for truth in the administration of justice in matters relating to contested paternity. This court further believes that the near unanimity of medical and legal authorities on the question of the reliability of blood grouping tests as an indicator of the truth in questioned paternity cases, justifies the taking of judicial notice of the general recognition of the accuracy and value of the tests when properly performed by persons skilled in conducting them. The law does not hesitate to adopt scientific aids to the discovery of the truth which have achieved such recognition. Cortese v. Cortese 10 N. J. Supp. 152, 72 A 2d 117 (1950).

This court has the duty to determine if the conditions exist which made the biological law operative. That is to say, were the tests properly made, and are the results as reported, free from error? If so, the exclusion of the defendant as the father must follow irresistibly.

Enlightened judicial acceptance of the verdict of science must result in the conclusion that where blood grouping tests in a bastardy proceeding, prove non-paternity, this court is not warranted in closing its mind to the conclusion which science declares is established—unless there is proof that the tests were not properly made, or that conditions did not exist to make the biological law operative.

That the Court of Appeals of Ohio, Eighth District, Cuyahoga County, accords great weight to the findings of a blood grouping expert excluding the defendant as being the father of the child is shown by that court's decision in the case of State of Ohio, ex rel. Gloria Rohde v. Bennett Robert Roush, Court of Appeals No. 23780, Juvenile Court No. 164756, decided June 1, 1956.

In this case the complainant contended that she had had sexual relations with the defendant in April of 1952, which was the probable date of the conception of the child born on January 4, 1953. The defendant admitted being with the complainant on two occasions in April, 1952, but contended he did not have relations with her until the early part of June, 1952.

Two serologists testified that as a result of their blood tests they concluded that the defendant could not be the father of the child. Patently, from the oral testimony by the defendant and the complainant, the jury was entirely justified in finding for the complainant since it was within their province to decide who was telling the truth.

The Court of Appeals held that there was "error prejudicial to the Appellant and, therefore, the judgment of the Juvenile Court is reversed as manifestly against the weight of the evidence and cause remanded to the Juvenile Court for further proceedings according to law." (Emphasis supplied.)

However, as the Court of Appeals did not write an opinion explaining the reasons for its conclusion, we can only guess or infer that the reason for holding the jury's verdict as being "manifestly against the weight of the evidence" was the testimony of the blood grouping experts excluding the defendant as the father of the complainant's child.

In accordance with enlightened judicial acceptance of the high value of blood-grouping tests properly conducted, I hold that in the absence of any competent proof that blood-grouping tests establishing non-paternity were not properly made, the results of such tests, scientifically conducted and objectively made by doctors expert in such field should be given such great weight by the court that the exclusion of the defendant as the father of the child, follows irresistibly.

I hold, further, that because this great weight must be accorded to the blood grouping test results as testified to by Dr. Marsters, complainant has failed to prove the guilt of the defendant by a preponderance of the evidence.

Accordingly, I find the defendant not guilty as charged in the complaint.