[Civ. No. 25093.   Second Dist., Div. One.   Aug. 21, 1961.]

CHARLES D. WAREHAM, Appellant, v. MARLENE J. WAREHAM, Respondent.

Wendell Mackay for Appellant.

Thomas J. Jeffers, Jr., for Respondent.

LILLIE, J.—Plaintiff husband appeals from an order modifying an interlocutory divorce decree, which decree he previously had obtained by default. The order, among other things, declared plaintiff to be the father of a second child (Shelley Marie), born subsequent to the interlocutory judgment, awarded custody thereof to defendant, and ordered plaintiff to pay certain sums for the child's support.

Plaintiff's action for divorce was filed on May 27, 1959; an interlocutory decree was entered on July 25 of the same year. The decree awarded custody of the parties' minor child, Charles Mitchell, to the defendant with reasonable visitation rights to plaintiff. Thereafter, on December 14, 1959, defendant secured an order directing plaintiff to show cause why (1) the decree should not be modified as to increase the amount payable for the support of Charles Mitchell, and (2) plaintiff should not pay for the medical care of an expected child and for its support. By subsequent amendment, defendant alleged that plaintiff was the father of said expected child. The allegation of his parenthood was denied by the plaintiff; upon the hearing, however, plaintiff admitted that he was not impotent during the period in question. Shelley Marie was born February 17, 1960.

Plaintiff contends that the adverse order below was based on evidence which "is inherently improbable, impossible and contrary to physical law"; we have concluded that neither the law nor the facts (necessarily viewed in a light most favorable to the defendant) support such claims.

We summarize the evidence received by the trier of fact.[1] Defendant testified that she commenced her menstrual period on May 8 or 9, 1959. The date of this period was challenged

---

[1]Plaintiff's opening brief makes rather extended references to defendant's disputed mistreatment of Charles Mitchell when the latter child was in her custody—solely, it appears, to attack her credibility as a witness. The order of June 17, 1960, from which this appeal is taken, relates to Shelley Marie alone, and plaintiff's whole argument is devoted to the question of the paternity of that child.

by plaintiff who stated that he last had intercourse with his wife on May 13, 1959, and that she moved out of the family bed and into another room on May 15. Defendant also told a friend on May 17 that she was then "cramping" and in her menstrual period. There was testimony that defendant, while at the hospital, assertedly stated to a male friend: "Yes, I will have you your baby boy." As already mentioned, the complaint for divorce was filed on May 27, although plaintiff continued to reside at the family domicile until the following day (May 28).

Defendant, on the other hand, testified that she last had intercourse with her husband on May 24 or 25; she did not deny that she told a witness for the plaintiff on May 13 that she did not feel well and should be menstruating "any day now." While acknowledging that she associated with other men immediately prior to the parties' separation, she denied any intimacies with such persons and further testified that she had not had intercourse with any man other than her husband.

Blood tests of the parties and Shelley Marie were taken by a qualified expert[2] pursuant to the provisions of section 1980.3, Code of Civil Procedure. These tests show that plaintiff could not have been the father of Shelley Marie.

Plaintiff's argument is as follows: (1) Although the child of a woman who has been married, born within 10 months after the dissolution of the marriage, is presumed to be legitimate (Civil Code, § 194), such presumption is only disputable and is conclusively overcome when blood tests establish that the mother's husband could not be the father (*Kusior* v. *Silver, supra,* 54 Cal.2d 603, 620); and (2), the conclusive presumption of legitimacy declared in section 1962, subdivision 5, Code of Civil Procedure, is not here applicable because the defendant was not "cohabiting" with her husband at the time of possible conception (*Kusior* v. *Silver, supra,* pp. 609-616); there is a somewhat subsidiary claim, not vigorously pressed, that the birth of the child did not occur within the usual or normal operation of the laws of nature, for which further reason the conclusive presumption in question does not apply. (*Estate of McNamara,* 181 Cal. 82, 96-97 [183 P. 552, 7 A.L.R. 313].)

---

[2]It has been said by way of dictum that "more than one expert must make the tests and agree upon the results . . ." *Kusior* v. *Silver*, 54 Cal.2d 603, 620, footnote 5 [7 Cal.Rptr. 129, 354 P.2d 657]).

As the *Kusior* case, *supra,* points out, in California we have "a dual system of presumptions" (54 Cal.2d 603, 620) relevant to the issue here. While the holding in that case clearly sustains plaintiff's position that the *disputable* presumption of legitimacy (Civ. Code, § 194) is conclusively rebutted when blood tests show that the mother's husband could not be the father, the situation is otherwise when the provisions of the *conclusive* presumption (Code of Civ. Proc., § 1962, subd. 5) are applied to the facts at bar. The latter statute provides: *"Notwithstanding any other provision of law,* the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate" (emphasis added).

■■ Declared in *Kusior* v. *Silver,* 54 Cal.2d 603 [7 Cal.Rptr. 129, 354 P.2d 657], to be a substantive rule of law, the statute was amended in 1955 (subsequent to the adoption of our Uniform Blood Test Act in 1953) to include the phrase above italicized; the addition of such language, according to the court in that case, indicated an overall legislative intent that persons concerned may not avail themselves of any other provision of law, including the Uniform Blood Test Act, to dispute the presumption therein created (54 Cal.2d 603, 618-619). The applicability of this conclusive presumption to the present case depends on whether it can be said that defendant at the time of the child's possible conception was "cohabiting" with plaintiff-husband.

■ In the *Kusior* case, *supra,* the court adopted the definition of "cohabiting" (as used in the statute) which is found in *Estate of Mills,* 137 Cal. 298, 301 [70 P. 91, 92 Am.St.Rep. 175] : "living together . . . ostensibly as husband and wife," and *Estate of Walker,* 180 Cal. 478, 491 [181 P. 792] : "living together in the same house or apartments" (54 Cal.2d 603, 611, 616) ; mere opportunity for access, it was there concluded, is not sufficient. ■ Plaintiff argues that there was no "cohabiting" within the meaning of the statute because the last act of intercourse with defendant-wife occurred on May 13, after which she moved out of the family bed and into another room, that this was followed by her menstrual period (commencing May 15), the filing of the divorce suit on May 27 and her departure from the family home the next day (May 28). He particularly stresses the inconsistencies in his wife's testimony concerning the onset of her menstrual period —thus, on one occasion that its commencement was several days later (at or about the time plaintiff testified that intercourse was had). Such latter argument ignores the estab-

lished rule that it is for the trier of fact to resolve conflicts, and this rule "applies as well to cases of inconsistencies and contradictions within the testimony of a single witness" (*People* v. *Hecker*, 179 Cal.App.2d 823, 827 [4 Cal.Rptr. 334]) ; furthermore, it is express statutory law that the trier of fact is the exclusive judge of the credibility of witnesses (Code Civ. Proc., § 1847). Unquestionably the trial judge impliedly determined, reconciling inconsistencies and resolving conflicts, that defendant's mentrual period had ended on or before May 24 or 25 at which time, while the parties concededly were "living together ostensibly as husband and wife" and "in the same house or apartments," an act of intercourse was accomplished which resulted in the conception of Shelley Marie. The situation in *Kusior* v. *Silver*, 54 Cal.2d 603 [7 Cal.Rptr. 129, 354 P.2d 657], of course, was altogether different; there the child's mother and her husband were living apart by virtue of an interlocutory judgment of divorce, and there was only an opportunity for access. Regardless of the seeming inequities here present, the unanimous decision in the *Kusior* case, *supra*, is controlling.[3]

Finally, we do not follow the subsidiary claim that the period of gestation in the present case was not normal— probably plaintiff is suggesting that defendant could not have conceived at the time claimed because (as he asserts) she was then menstruating. If the child was conceived on May 24 or 25, 1959 (which the trial court impliedly found), the period of gestation, ending on February 17, 1960, was anything but abnormal, being 269 or 270 days. It has been observed that "the periods of pregnancy range from 220 days to 330 days." (*Dazey* v. *Dazey*, 50 Cal.App.2d 15, 20 [122 P.2d 308].)

The order is affirmed.

Wood, P. J., concurred.

FOURT, J.—I concur in the judgment because I agree that this court is bound by the decision of the Supreme Court in *Kusior* v. *Silver*, 54 Cal.2d 603 [7 Cal.Rptr. 129, 354 P.2d 657], wherein that court held in effect that the results of

---

[3]In *Kusior* v. *Silver*, 54 Cal.2d 603 [7 Cal.Rptr. 129, 354 P.2d 657], it was contended that the declared supremacy of the conclusive presumption was inconsistent with constitutional principles "in that there is no reasonable relationship between the presumption and the fact sought to be presumed in a case in which there is scientific evidence to the contrary [citation]"; however, appellant did not suggest that "the Legislature [had] no interest in or power to determine, as a matter of over-

blood tests "may not be used to controvert the conclusive presumption of paternity created by subdivision 5 of section 1962 of the Code of Civil Procedure." [P. 620.] I believe, however, that that court was in error in its determination of the case. (See *Berry* v. *Chaplin* (1946), 74 Cal.App.2d 652, 667 [169 P.2d 442]. See also 37 N.D.L.Rev. 1110; 48 Cal.L. Rev. 852; 34 So.Cal.L.Rev. 104; with reference to the decision in *Kusior* v. *Silver*.)

I think that the statement of the facts in this case should, under the circumstances, be extended and therefore I shall set forth a résumé of the same as I read the transcript.

The parties in this case were married in January 1956, at which time defendant was 17 years of age. She was 21 years of age at the time of trial.

The plaintiff husband filed the action for divorce on May 27, 1959. The complaint alleged that the parties separated on or about May 22, 1959. An interlocutory decree of divorce was granted as prayed for on July 2, 1959. The defendant wife was awarded the custody of Charles Wareham, the child (aged about 10 months) of the parties and plaintiff was ordered to pay a specified sum for his support and maintenance. The community property of the parties was awarded in part to each of the persons and a property settlement agreement made and entered into between the husband and wife was approved.

On December 14, 1959, the defendant wife filed a petition to modify the interlocutory judgment. She set forth among other things therein that she "was unaware at the time of the decree that she was pregnant and she is now expecting a child" and further asked for $100 per month for the support and maintenance of *each* child and "medical care for the expectant child."

The husband, on January 7, 1960, filed a certificate in opposition to the application of the wife. He set forth that he was not the father of the unborn child and that he had not cohabited with the wife since the 13th day of May, 1959. He further stated that the wife and Roswell Hahn clandestinely

riding social policy, that given a certain relationship between the husband and wife, the husband is to be held responsible for the child. There are significant reasons why the integrity of the family when husband and wife are living together as such should not be impugned. A conclusive presumption is in actuality a substantive rule of law and cannot be said to be unconstitutional unless it transcends such a power of the Legislature [citation]." (54 Cal.2d 603, 619.)

associated prior to the separation of the plaintiff and defendant and that from and after July 15, 1959, Hahn and the wife were living together with the minor child, Charles.

On January 7, 1960, the plaintiff secured an order to show cause directing the defendant to show cause why the interlocutory decree should not be modified by giving him the custody of Charles upon his sworn statement that the wife was immoral, living with Hahn out of wedlock in the presence of Charles, the child, that she failed and neglected to care for the physical and other needs of Charles.

Thereafter on February 10, 1960, there was filed another order to show cause proceeding by the plaintiff wherein it was set forth that Charles had been beaten and maltreated by the wife and that she had been guilty of other bad conduct unnecessary to mention here and the plaintiff asked for the permanent custody of Charles.

The defendant filed an amended order to show cause proceeding on March 14, 1960, wherein she again set forth that she did not know that she was pregnant on July 2, 1959, that she had given birth to a child on February 17, 1960, that the child was conceived while she was living with plaintiff and that the child was the issue of the plaintiff and thereupon asked for $100 per month for each child plus medical care and attorney's fees.

Plaintiff filed an answer to the charges to the effect that he was not the father of the child, born or unborn, mentioned in the wife's proceedings.

The cause was heard in part at various hearings and on June 17, 1960, the judge made an order that the plaintiff was the father of the child, Shelley Marie, born on February 17, 1960, to the defendant. The evidence is in effect uncontradicted that the plaintiff had an act of sexual intercourse with the defendant on May 13, 1959. The defendant, however, had associated on occasions prior to May 13, 1959, with other men, including Hahn. The husband testified that the wife menstruated on the 15th of May, 1959. There was other evidence to the effect that she menstruated on May 14, 1959. She stated that Hahn was at her house about five nights a week after her separation from the husband. She never mentioned to her husband until January of 1960 that he was the father of the unborn child. Hahn and the defendant went to the hospital together at the time of the birth of Shelley Marie. It was stated and not denied by the defendant that

she said to Hahn at that time in effect, "Yes, I will have you your baby boy."

There was substantial evidence that the child Charles was beaten, abused and maltreated by the defendant when he was in the defendant's custody. She denied that she had beaten the child. However, there was uncontradicted medical testimony to the effect that the bruises and other evidences of rough treatment upon the child could not have been self-inflicted.

The husband found evidence on the clothing of the wife when she came home early in the morning on May 19th which strongly indicated that she had been engaging in acts of sexual intercourse on that particular night. Her testimony was that she and her husband had an act of intercourse "around the 24th or 25th" of May, that she had menstruated on May 8 or 9; however, she kept no records. She also stated in effect that she and her husband were estranged for quite some time before the separation; that at times she slept in other parts of the house away from her husband, shortly before the separation. She testified positively that she had no act of sexual intercourse with any one other than the plaintiff for a period of one year previous to the birth of the child, Shelley Marie. In other words, she stated under oath that from February 17, 1959, to February 17, 1960, she had not engaged in any act of sexual intercourse with anyone other than the plaintiff.

A skilled and trained physican testified that certain blood tests were made of the plaintiff, the defendant and Shelley Marie born February 17, 1960, and that it was a scientific and physical impossibility for the plaintiff to be the father of Shelley Marie. The doctor made several tests to make certain of his position. His qualifications and the results of the tests are uncontradicted. I will assume hereafter that the results of the tests demonstrated and showed that the plaintiff could not possibly be the father of Shelley Marie.

The judge indicated that he wanted memoranda from respective counsel with reference to the provisions of section 1962, subdivision 5 of the Code of Civil Procedure which reads as follows:

"The following presumptions, and no others, are deemed conclusive: . . .

"5. Notwithstanding any other provision of law, the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate; . . ."

At a continued hearing the judge heard arguments at which time the defendant argued that "from the fact the husband testified that from his own admission that he had relations on May 13, which is within four days of the nine months period within which the child was born—so it is clearly a matter of law that the conclusive presumption has been met." The court then said, "under the facts before me I have no choice under the law but to find plaintiff is the father of the child Shelley Marie, born February 17, 1960. You may proceed on the question of custody."

The trial judge obviously proceeded upon the theory that access, or opportunity for access was sufficient to constitute cohabitation under the circumstances. The most recent interpretation put upon the word or term "cohabitation" as set forth in *Kusior* v. *Silver*, 54 Cal.2d 603 [7 Cal.Rptr. 129, 354 P.2d 657], decided August 12, 1960, was not in effect at the time of the trial. In fact it appears (and it was so stated at the oral argument) that the trial judge relied upon the definitions of "cohabitation" as contained in *Kusior* v. *Silver*, as decided by this court on February 2, 1960, and reported in 2 California Reporter 580.

I am fully aware of the rule that the trial judge is the exclusive judge of the credibility of a witness and the weight of the evidence. There are, however, exceptions in the situations where the witness testifies to inherent improbabilities. (See *Davis* v. *Judson*, 159 Cal. 121, 128 [113 P. 147]; *La Jolla Casa de Manana* v. *Hopkins*, 98 Cal.App.2d 339, 346 [219 P.2d 871].)

Furthermore, there is the question of interest of the witness and the occasions when a witness testifies falsely in part. (See Code of Civ. Proc., § 2061, subd. 3.)

Much of what appears to be the law of the state at present is based upon what was said in *Estate of Mills* (1902), 137 Cal. 298 [70 P. 91, 92 Am.St.Rep. 175]. In that case the respondents found it necessary to allege and prove that they were the illegitimate children of Robert Mills, deceased. They called their mother as a witness in their behalf. The mother was married during the times in question. The court, in referring to section 1962, Code of Civil Procedure, subdivision 5, stated "The word 'cohabiting,' as used in the above section, means the living together of a man and woman ostensibly as husband and wife. (1 Bishop on Marriage, Divorce, and Separation, § 1669, note 1.)" [P. 301.] The court then went on to cite some of Shakespeare's poetry from King John, act I,

scene 1, and held in effect that it was error to permit the mother of the children to testify that her husband was not the father of the children. The court also set forth that the conclusive presumption section was founded in decency, morality, and public policy.

The court further said, "It would require a very plain and express statute to convince us that the legislature intended to do away with a rule founded upon *good morals and public policy, and to allow evidence which shocks every sense of decency and propriety.*" (Emphasis added.) (*Estate of Mills*, 137 Cal. 298 at p. 303 [70 P. 91, 92 Am.St.Rep. 175].)

However, the opinion concludes with the general statement to the effect that the law is not as rigid as it was formerly in cases of this kind and then proceeds to cite the so-called "*modern rule*" as stated by Lord Langsdale in *Hargrave* v. *Hargrave* (1846), 9 Beav. 552 at page 304:

"The modern rule was stated by Lord Lansdale in *Hargrave* v. *Hargrave,* 9 Beav. 552, as follows: 'A child born of a married woman is in the first instance presumed to be legitimate. The presumption thus established by law is not to be rebutted by circumstances *which only create doubt and suspicion,* but it may be wholly removed by proper and sufficient evidence showing that the husband was (1) incompetent; (2) entirely absent, so as to have no intercourse or communication of any kind with the mother; (3) entirely absent at the period during which the child must, in the course of nature, have been begotten; or (4) only present under such circumstances as afford clear and satisfactory proof that there was no sexual intercourse.' " [P. 304.] (Emphasis added.)

It is to be noted that in the case before us there is no real reliance so far as the husband is concerned upon his own testimony. He relies upon the testimony of a disinterested scientist and the results of a scientific test. The wife in this case relies upon her own testimony which was thoroughly impeached in practically every detail. Furthermore, it is to be noted that in 1902, so far as I can find, blood tests were unheard of. A blood test result does not "only create doubt and suspicion," it infallibly establishes a fact.

In *Estate of Walker* (1917), 176 Cal. 402, 410 [168 P. 689] the court concluded by saying:

". . . Before such a child can be adjudged a bastard, the proof must be clear, certain, and conclusive either that the husband had no powers of procreation, *or the circumstances*

*were such as to render it impossible that he could be the father
of the child."*

There were no conclusive blood tests in 1917, but the court
pointedly stated in effect that if the *"circumstances were such
as to render it impossible"* that the husband be the father of
the child, then in such event he would not be held to be the
father.

In *Estate of Walker* (1919), 180 Cal. 478, 491 the court said
at pages 491-492 [181 P. 792] :

"The English rule would seem to go so far as to permit
evidence of nonintercourse even where the parties are co-
habiting, i.e., living together in the same house or apartments.
Such is not the rule in this state.   (Code Civ. Proc., § 1962,
subd. 5; *Estate of Mills,* 137 Cal. 298 [92 Am.St.Rep. 175, 70
P. 91.]   But with this statutory exception the true rule in
America, as well as England, is, we believe, *that if it is pos-
sible by the laws of nature for the husband to be the father*
(that is, if there was coition and no impotency), no inquiry
will be permitted into the probabilities of the case one way
or the other, but the presumption of legitimacy is conclusive;
and, *on the other hand, it is always permitted to show that it
was not possible by the laws of nature for the husband to be
the father,* as by showing impotency on his part, want of inter-
course during the possible period of conception, or that the
child is of a race or color such that it could not have been
conceived by the husband.   [Emphasis added.]

*"The fact that it was not possible by the laws of nature for
the husband to be the father, where that fact is in issue, is to
be inquired into in the same manner as any other fact which is
the subject of judicial inquiry,* and any competent evidence
relevant to the question is admissible as in other cases, it being
the rule, however, in California, as in many jurisdictions, that
neither the husband nor the wife is competent to testify to
lack of intercourse.   (*Estate of Mills, supra.*)   [Emphasis
added.]

"It should perhaps be noted that when it is said that the
presumption of legitimacy is conclusive if it were possible
by the laws of nature for the husband to be the father, it is
not meant that the proof of the fact of such impossibility must
itself be beyond possibility of doubt.   The two things are
very different.   *The fact to be proven is that the husband
could not by the laws of nature be the father,* as, for example,
because of lack of intercourse with the mother.   The evidence

of that fact is not required to be such as to prove it beyond any possibility of doubt. A jury would be justified in finding a lack of intercourse, with the consequences that it was impossible that the husband be the father upon evidence which did not show such lack beyond possibility of question. The presumption of legitimacy is strong and the proof of impotency or nonintercourse must be clear and satisfactory, but this is all. *The presumption does not operate to change the general rule that in civil cases the issue is to be determined upon the preponderance of evidence, but like other presumptions operates under and beneath that rule.* [Emphasis added.]

"It remains to apply the foregoing views to the particular case. It is apparent at once that the action of the lower court in not confining the evidence to a showing of want of opportunity for intercourse between Walker and his wife was correct, and that errors complained of by appellant must be judged on the basis that although such opportunity did appear, yet evidence to the point that intercourse during the critical period did not take place was admissible, and the question of whether it did or did not was the real question to be submitted to and decided by the jury."

It is at once apparent that the court in *Walker* dealt with the circumstances as they existed in 1919, at which time the tests which are now available were not in existence.

In *Estate of McNamara* (1919), 181 Cal. 82 the court said at pages 88-89 [183 P. 552, 7 A.L.R. 313] : "The presumption of legitimacy is discussed in *Estate of Walker,* 180 Cal. 478 [181 P. 792]. It is there said that *if it appear that it is possible by the laws of nature for the husband to be the father of the child,* that is, if he had intercourse with his wife during the period of possible conception, he is conclusively presumed to be the father, that the law will permit no guessing or weighing of probabilities as between the husband and some other man, when both have had intercourse with the mother during the critical time and either may in fact be the actual progenitor. This rule in cases *where only a usual and normal period of gestation* is involved is thoroughly well established, and the reasons of policy upon which it is based are so strong that it is the rule of both the civil and the common law." [Emphasis added.]

It is further stated therein : ". . . The second question is one of law, namely : Does the conclusive presumption of legitimacy apply where the period of gestation necessary in order

that the husband be the father is not an impossible one, but is yet exceptional and not according to the usual operation of the laws of nature?''

Again in *Estate of McNamara*, at page 91: ''This conclusion makes necessary a consideration of the second question: *Is the conclusive presumption of legitimacy applicable to such a case? This is not determined by any statutory provision.* Section 1962, subdivision 5, of the Code of Civil Procedure, provides: 'The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.' *Read literally this section would apply only where the wife is cohabiting with her husband at the time of issue, that is, of birth.* This was not the fact in the present case. But putting upon the section the meaning it undoubtedly should have, namely, that issue of a wife cohabiting with her husband at the time of conception must be indisputably presumed legitimate, it yet does not determine the present case, for it still leaves open the very question involved, of when was conception or during what period must it be presumed to have taken place.'' [Emphasis added.] It is further stated at page 95:

''Nor is there any reason of public policy which requires such extending of the conclusive presumption. *The prima facie presumption of legitimacy which requires clear and satisfactory proof for its overcoming is founded on the policy of protecting the integrity of the family, of preventing the bastardizing of issue born in wedlock except upon clear and certain evidence.* The reason for going beyond this *prima facie* presumption and applying a conclusive presumption wherever the husband has had intercourse with the wife during the time when the child must normally have been conceived, although others as well may have had intercourse with her during the same period, *is the impossibility of determining under such circumstances who is the father.* As was said in *Commonwealth* v. *McCarty*, 2 Clark (Pa.) 356, the process of conception is a hidden one and the organs perform their appropriate functions without the volition of the female and without her being conscious that the process is going on. Where she has had intercourse with more than one man at about the same time and a child has resulted, neither she nor anyone else can say with reasonable certainty which is the father. Any weighing of probabilities under such circumstances is but guessing, and *where the husband is one of the possible*

*fathers,* he must bear the burden of his relation to the woman and be taken to be the father of her child. [Emphasis added.]

"*There is one class of cases where it is recognized in this country at least, that the husband is not to be taken as the father of the child, even though he had intercourse with his wife during the normal period of conception. That instance is where the husband and wife are of the same race, as for instance, white, and it appears that the wife has had intercourse with a man of another race, as, for instance, a negro, and the child is of mixed blood.* (*Watkins* v. *Carlton,* 10 Leigh (Va.) 560; *Bullock* v. *Knox,* 96 Ala. 198 [11 So. 339]; *Wright* v. *Hicks,* 12 Ga. 161 [56 Am.Dec. 451]; *Cross* v. *Cross,* 3 Paige (N.Y.) 139 [23 Am.Dec. 778].) *The reason why the conclusive presumption is not applied in such instances is that the element of indeterminability which is the reason for the presumption in the ordinary case is absent. It is clear that the husband is not the father. The actual fact, in other words, is capable of definite determination, and for this reason the conclusive presumption which is a substitute for such determination is not properly applicable.* [Emphasis added.]

". . . The court must reason in accordance with the usual operation of the law of nature, and where it appears that the child was born at such a time that the husband might possibly be the father but only in case of a very exceptional departure from the usual operation of the laws of nature, and it also appears that the wife has had intercourse with another at the time when by the usual operation of these laws he would be the father, the conclusion that the latter is the father is, in the absence of any symptoms or circumstances indicating an exceptional period of pregnancy, well-nigh irresistible."

In the case before us there is no necessity to weigh any probabilities; the fact as to whether the husband can be the father is ascertainable *beyond any doubt* whatsoever. It will be noted that the court in *McNamara* (181 Cal. 82), had no trouble in interpreting the statute in question and in fact wrote into it something which is not there. Furthermore the court stated in effect that where it was clear that the husband was not the father of the child he would not be so held.

In *Anderson* v. *Anderson* (1931), 214 Cal. 414 [5 P.2d 881] the defendant husband, in a divorce action, contended that he was not the father of the plaintiff's child. The issue was whether the child was the daughter of the defendant husband. The child was born on September 1, 1926, three and one-half months after the marriage. The first act of intercourse be-

tween the parties to that action took place at a time (before the marriage) which was less than 200 days before the child was born. The court said, "According to the record a child delivered following a 200-day period of gestation could, *under no case known to science or experience,* be fully developed as this child was." Further, ". . . *It is insubstantial in the highest degree, and to permit it to control the undisputed and physical facts, for the purpose of supporting a finding giving to the defendant an heir by a stranger, would be to tax human credulity to the breaking point.* (214 Cal. at p. 416.)

"*It remains to be determined whether the presumptions of legitimacy are controlling in the plaintiff's favor in the face of facts established beyond the peradventure of a doubt.* First we have the presumption declared by subdivision 5 of section 1962 of the Code of Civil Procedure that 'the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.' *But this presumption prevails only where the period of gestation following intercourse with the husband is usual and normal. (Estate of McNamara,* 181 Cal. 82 [7 A.L.R. 313, 183 P. 552]; 13 Cal. Jur. p. 921.) *It cannot prevail as against undisputed facts to the contrary and at variance with the laws of nature.* [Emphasis added.]

"Then there is the presumption declared by subdivision 31 of section 1963 of the Code of Civil Procedure 'that a child born in lawful wedlock, there being no divorce from bed and board, is legitimate.' By the same section it is presumed in subdivision 28 that things have happened in the ordinary course of nature. These presumptions are declared to be satisfactory if uncontradicted and may be controverted by other evidence. While the proof necessary to overthrow the presumption of legitimacy in such a case as this must be clear and satisfactory (*Estate of Walker,* 180 Cal. 478 [181 P. 792]), it has been held that where the conception of a child is before marriage a slighter degree of proof is necessary to overcome the presumption of legitimacy. (*Wright* v. *Hicks,* 17 Ga. 160 [60 Am.Dec. 687].) While it may be said that the authorities as to the degree of proof in such a case are in conflict (*Jackson* v. *Thornton,* 133 Tenn. 36 [179 S.W. 384]), *we are here not called upon to weigh the probabilities, for we have a case where the fact of prenuptial pregnancy by a stranger is established beyond question, and the presumption of legitimacy no longer obtains.*" [Emphasis added.]

In the case before us as in *Anderson* there is no question of probabilities. The undisputed physical facts are that the husband cannot possibly be the father of Shelley Marie. There is nothing in the statute with reference to any normal period of gestation and there is nothing therein with reference to blood groupings, however, it appears to me that if the court makes an exception for the one (as it did in *Anderson*) because it taxes ''human credulity'' it ought to make an exception in the other for the same reason.

In *Hughes* v. *Hughes* (1954), 125 Cal.App.2d 781 [271 P.2d 172] the court held in effect that where the laws of nature *made it possible* that the husband is the father, the presumption is conclusive; but where the laws of nature do not, only the disputable presumption applies. The court determined that if the husband was sterile he could not be the father—this in the face of the wording of the statute where sterility is not even mentioned.

In *State* ex rel. *Steiger* v. *Gray* (Ohio, 1957), 145 N.E.2d 162 the court had before it the question, ''Should a court permit a man to be adjudged the father of a child when the blood tests exclude paternity by the immutable law of genetics?'' The court said among other things at page 165:

''It is apparent that the testimony adduced from the parties and other lay persons in bastardy proceedings, by its very nature, may be susceptible to doubt and question. It is usually self-serving. The alleged intercourse between the woman and the putative father is almost always carried on clandestinely and secretly. Seldom if ever is there any reliable corroborating eyewitness testimony. Circumstantial evidence must be relied upon to a great extent. In other words, such testimony in such cases may be as reliable or as unreliable as the persons giving it. . . .

''Blood grouping tests have been called 'the fingerprints of blood'—and to a degree this is correct.

''Such tests, conducted for the purpose of determining nonpaternity, are based upon the scientific principle that the type of blood of a child is inherited from a combination of blood groups in the blood of its parents.

''Should the blood groups of the child in question not correspond to the parental combinations of blood groups, the accused man could not possibly be the father of that child.

''Thus, if a factor is present in the blood of the child and is absent in the blood of the mother, said factor should be

found in the blood of the man who is the child's true father. However, if the blood of the accused man charged with being the father lacks that factor, that lack excludes him as the true father. . . .

"This operation of blood tests to prove non-paternity may be reduced to this simple homely illustration:

"If an apple is found under an apple tree the natural inference is that it came from that or some other apple tree.

"However, if a pear is found under an apple tree, it is clear under the laws of nature that some other tree with pear-producing factors produced that pear, and the apple tree under which the pear was found must definitely be excluded as the parent-tree.

"At present, practical application of blood grouping in bastardy cases is restricted to ruling out paternity, rather than attempting to establish it. Applying this principle, it is apparent that the apple could have come from any apple tree. Therefore, it is difficult and unsafe to establish which is the parent apple tree. It could have been one of several. But it is comparatively simple to exclude the apple tree as the parent of the pear found under it. Accordingly we must look for a tree with pear-producing factors as the parent tree." The court in *State* v. *Gray* goes on further at page 168: "Enlightened judicial acceptance of the verdict of science must result in the conclusion that where blood grouping tests in a bastardy proceeding prove non-paternity, this court is not warranted in closing its mind to the conclusion which science declares is established—unless there is proof that the tests were not properly made, or that conditions did not exist to make the biological law operative."

The prefatory note to the Uniform Act on Blood Tests to Determine Paternity, reads in part as follows:

"In paternity proceedings, divorce actions and other types of cases in which the legitimacy of a child is in issue, the modern developments of science have made it possible to determine with certainty in a large number of cases that one charged with being the father of a child could not be. Scientific methods may determine that one is not the father of the child by the analysis of blood samples taken from the mother, the child, and the alleged father in many cases, but it cannot be shown that a man is the father of the child. If the negative fact is established it is evident that there is a great miscarriage of justice to permit juries to hold on the basis of oral testimony, passion or sympathy, that the person

charged is the father and is responsible for the support of the child and other incidents of paternity. . . .

"There is no need for a dispute among the experts, and true experts will not disagree. Every test will show the same results.

"As to the make-up of the blood, the testing process is reasonably simple. It is practically the same thing in which the 11 million or more men were tested in determining blood types in the service. It is the same kind of test made of the blood of donors to the Red Cross and hospital blood banks. Consequently, this is one of the few classes of cases in which judgment of court may be absolutely right by use of science. In this kind of a situation it seems intolerable for a court to permit an opposite result to be reached when the judgment may scientifically be one of complete accuracy. For a court to permit the establishment of paternity in cases where it is scientifically impossible to arrive at that result would seem to be a great travesty on justice." (Uniform Laws Annotated, 9 Miscellaneous Acts, 1955 Pocket Part, p. 13.)

The subject of blood tests under the circumstances, as presented in this case, is discussed at length in Schatkin, Disputed Paternity Proceedings (3d ed. 1953). This court, or any court, may take judicial notice of facts appearing so abundantly from authoritative works on the subject.

An authority on legal medicine has perhaps explained the reluctance of courts to give sufficient weight to scientifically established facts by saying, " 'Judicial disregard of blood tests exclusions is no doubt due to a misconception of the true nature of the exclusion, which is a demonstrable and scientific fact of life. It is neither controversial nor in the field of expert testimony. The pathologist whose report excludes paternity is not giving "opinion" evidence. He is testifying to the reaction of the red blood cells—testifying to a fact of life and Nature.' Gradwohl, Legal Medicine, (1954), p. 576."

As said in *Jordan* v. *Mace* (1949), 144 Me. 351 [69 A.2d 670 at page 672] : " ' *We are not disposed to close our minds to conclusions which science tells us are established. Nor do we propose to lay down as a rule of law that the triers of fact may reject what science says is true; for to do so would be to invite at some future time a conflict between scientific truth and stare decisis and in that contest the result could never be in doubt.' "* [Emphasis added.]

Or, as Mr. Chief Justice Cardozo stated in *In re Findlay,*

253 N.Y. 1 [170 N.E. 471, 473], with reference to the matter of the presumption which was under consideration:

*"At times the cases seemed to say that any possibility of access, no matter how violently improbable, would leave the presumption active as against neutralizing proof. Rex v. Luffe, supra, per Lord Ellenborough; Head v. Head, 1 Sim & S. 150. A formula so inexorable has yielded with the years to one more natural and supple. There are survivals here and there of the rule of olden days. Cf. Powell v. State ex rel. Fowler, 84 Ohio St. 165 [95 N.E. 660, 36 L.R.A. N.S. 255]; Bunel v. O'Day (C.C.) 125 F. 303, 317; Patterson v. Gaines, 6 How. [U.S.] 550, 589 [12 L.Ed. 553]. By and large, none the less, the courts are generally agreed that countervailing evidence may shatter the presumption though the possibility of access is not susceptible of exclusion to the point of utter demonstration.* Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities. [Citation.] They will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty. Some of the books tell us that, to overcome the presumption, the evidence of nonaccess must be 'clear and convincing' [Citations]; others that it must lead to a conclusion that is 'strong and irresistible' [Citation]; others that it must be proof 'beyond all reasonable doubt' [Citations]. [Emphasis added.]

"What is meant by these pronouncements, however differently phrased, is this, and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides. If husband and wife are living together in the conjugal relation, legitimacy will be presumed, though the wife has harbored an adulterer. [Citations.] It may even be presumed though the spouses are living apart if there is a fair basis for the belief that at times they may have come together. Whether such a basis exists in any given instance is to be determined, however, in the light of experience and reason. The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false. [Citation.] . . .

". . . 'When all the ends which the presumption of legitimacy is designed to conserve have been defeated by sordid facts, the courts must deal with the situation in a common sense way.' . . . There are breaths of human nature at which presumptions shrink and wither. . . .

"Viewing the evidence before us in all its cumulative significance, we think it points with overwhelming force to

one conclusion and one only. We have no thought to weaken the presumption of legitimacy by allowing its overthrow at the call of rumor or suspicion, or through inferences nicely poised. What we are now holding is in line with the historical development which has shorn the presumption of some of its follies and vagaries. Follies and vagaries by concession there have been. We have abandoned the 'nonsense' of the rule of the four seas. We no longer adhere to Lord Campbell's dictum [Citation] that a mulatto child born of a white mother must be ascribed to the white husband, and not to the black paramour, if the husband had access to his wife during the period of gestation. [Citations.] Extravagances hardly less violent there have been at other times in insisting upon the negation of every shadowy possibility. These and nothing more we are pruning from the law.''

Wigmore on Evidence, third edition, volume 9, page 292, section 2492, in discussing conclusive presumptions, states:

''In strictness, there cannot be such a thing as a 'conclusive presumption.' Wherever from one fact another is said to be conclusively presumed, in the sense that the opponent is absolutely precluded from showing by any evidence that the second fact does not exist, the rule is really providing that, where the first fact is shown to exist, the second fact's existence is wholly immaterial for the purpose of the proponent's case; and to provide this is to make a rule of substantive law, and not a rule apportioning the burden of persuading as to certain propositions or varying the duty of coming forward with evidence. . . .

''The term has no place in the principles of Evidence . . ., and should be discarded.''

If the theory of the court is to protect the child from the stigma of illegitimacy, it is a mistaken idea. The child will ultimately know by the very nature of things that in fact and in truth the plaintiff in this action was not her father and that it was an absolute scientific impossibility that the plaintiff in this action could have been her father and yet the law is so declaring that the plaintiff is the father. What respect for the law does such a course build in either the mind of the person who is most directly affected, namely the child or in the mind of the general public from which the support of the law emanates. This brand of so-called justice is not substantial in any sense because it is grounded on hypocrisy and untruths.

The matter of "the integrity" of the family has been referred to from time to time as something which should not be impugned and that therefore the conclusive presumption should prevail regardless of truth or fact.

Integrity is a state of quality of being complete, undivided or unbroken—an unimpaired state, moral soundness, honesty, freedom from corruption—a state of innocence.

To impugn is to assail, to deny.

Does anyone believe that there is any integrity in the family where the wife has admittedly associated with other men and has given birth to a child which could not possibly in fact be the child of her husband and the husband has so charged such facts in a verified proceeding and has proven his allegations therein set forth beyond a peradventure of a doubt. Where is the moral soundness, the freedom from corruption, the state of innocence to be preserved in such a situation?

What does the social conscience of the community gain by blindfolding itself to the truth? It may have been good law in a day gone by when blood tests were unknown but we are no longer in that era. Even in the so-called "days gone by," the courts held that the husband could establish nonaccess, impotency or that *"the circumstances were such as to render it impossible that he could be the father of the child."* (*Estate of Walker*, 176 Cal. 402, 410 [168 P. 689].) [Emphasis added.]

There is some intimation in *Kusior* that the fault lies with the Legislature in adopting certain statutes in 1955. I am convinced that it was not intended by the author of the Assembly bills or of the Legislature which adopted the bills which ultimately became the Statutes of 1955, chapter 948, to provide in effect that the conclusive presumption of section 1962, subdivision 5, Code of Civil Procedure should prevail over any blood tests and the laws of nature. The "Review of Selected 1955 Code Legislation," prepared by the Department of Continuing Education of the Bar of the University of California Extension states with reference to the amendments in question as follows:

"§ 3b. Civil Code. Section 195, as amended: Disputing presumption of legitimacy.

"195. The presumption of legitimacy can be disputed only by the people of the State of California in a criminal action brought under the provisions of Section 270 of the Penal Code or the husband or wife or the descendant of one or both

of them. Illegitimacy in such case, may be proved like any other fact.

"Background—Civil Code Sections 196 and 196a provide a civil duty of support by parents with respect to their children Section 196 applying to legitimate children and Section 196a applying to illegitimate children. Because of the cost involved in civil actions, the duty of support is often enforced by prosecutions under Penal Code Section 270. See 2 Armstrong, California Family Law 1160.

"Prior to the passage of the amendments under discussion, the state had no right to question the legitimacy of a child by disputing the presumption of legitimacy created by Section 194. Therefore, in cases where the wife lived apart from her lawful husband without obtaining a divorce, and bore children by a man other than her husband, the state could not enforce the provisions of Penal Code Section 270 against the natural father of the children, as they were presumed to be the children of the mother and her lawful husband. *In re Madalina* (1917), 174 Cal. 693 [164 P. 348, 1 A.L.R. 1629]. In an attempt to circumvent this holding, the prosecution in *People* v. *Kovacevich* (1937), 19 Cal.App.2d 335 [65 P.2d 807], offered in proof of paternity a prior judgment in a civil suit for support brought by the child under Civil Code Section 196a. The conviction of the father based on this prior civil judgment was reversed, on the ground that the burden of proof in a criminal case was greater, and that the civil action was not *in rem*. See 2 Armstrong, 905-906, 1159-1160. The court indicated that if the issue of paternity had been the sole issue (as it would be in an action under Civil Code Section 231), paternity might have been considered to have been conclusively established.

"General Effect of Amendment—The present amendment to Section 195, coupled with the amendment to Penal Code Section 270e, set forth in § 81a, *infra*, and with the amendment to Code of Civil Procedure Section 1962, set forth in § 59a, *infra*, make it clear that the state may now enforce the duty of support owed by the natural father to his children (regardless of the fact that the mother is married to another person) by disputing the presumption of legitimacy created by Civil Code Section 194. For a criticism of the prior law and an excellent discussion of the problem, see 2 Armstrong, California Family Law 902-909, 1156-1160."

It is further stated in "Review of Selected 1955 Code Legislation," section 59a, page 134:

"§ 59a. Code of Civil Procedure. Section 1962, as amended: Disputing the presumption of legitimacy. (Only the portion of Section 1962 material to the amendment is here set forth.)

"1962. The following presumptions, and no others, are deemed conclusive:

". . .

"5. Notwithstanding any other provision of law, the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate; . . ." (See also the 1961 Cumulative Supplement for volume 2 of Armstrong, California Family Law, page 295, where it is set forth:

"Note and Comment: The twofold objective of the amendments to CC § 195, CCP § 1962 (5) and Pen. C. § 270e apparently was (1) to free the hands of the penal authorities from previous limitations on their right to challenge the presumed legitimacy of a child and to prove the child's actual paternity for the purpose of enforcing the real father's support obligation; and (2) for purposes of civil litigation to leave the previous rules unchanged. (See pp. 882 et seq.)

"It would seem that up to a certain point this objective probably has been carried out by the changes made. That is to say, it would seem under the new legislation that the wife clearly may not in the first instance in a *Mills* case situation (see p. 884) challenge the conclusive presumption in a civil suit.

"But—query—suppose such *Mills* case situation arises during the lifetime of the alleged natural father and the state successfully prosecutes the latter under Pen. Code § 270, thus in a proceeding which requires the most exacting proof (beyond reasonable doubt) establishing paternity by a person other than the husband; Suppose thereafter the husband sues his wife for divorce for adultery and she receives custody of this child. May the divorce court rely on the conclusive presumption of CCP § 1962, subsec 5, and give a support order against the husband for the child's maintenance? In other words, having found the fact of *non-paternity* of the father in the penal suit is the court in a later civil suit free to disregard this adjudicated fact? It may be doubted. It is possible of course to read the Pen. C § 270e amendment as limited by the CCP § 1962 (5) amendment. Both were enacted into law via the same bill, the change in 1962 (5) being made in the last paragraph of the bill. To so construe the changes, however, as has been stated, apparently would be contrary to the inten-

tion of the joint committee of the two legislative houses that reported the final draft of the bill for passage.''

The bill as introduced in the Assembly did not refer to the presumption mentioned in section 1962, subdivision 5, Code of Civil Procedure. As heretofore indicated the bill in its original form was in effect to amend section 270e of the Penal Code and section 195 of the Civil Code and was adopted by the Assembly in that form. (See Assembly Journal May 4, 1955.)

On the Senate side the bill was amended (Amendment No. 5) by providing, ''The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate, *except as provided in Section 195 of the Civil Code*.'' The bill was adopted by the Senate as amended on May 10, 1955. The assembly voted to *not concur* in the Senate amendments and each house appointed members to a conference committee. The conference committee, with reference to the provisions in question, proposed that the amendment read as follows: ''Notwithstanding any other provision of law, the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.'' Both houses adopted the conference committee report.

Query, what was the purpose sought to be achieved by the Legislature? It is readily apparent from every angle of approach to the subject matter that the evil to be corrected was the gap which had been opened up in the enforcement of the criminal law. The Legislature did not have in mind to occasion injustice and to bring about absurd and unfair consequences. Presently, the statute as construed leads to mischief and ridiculousness. It should be interpreted as to be consonant with justice, sound sense and a wise policy.

If the amendment to section 1962, subdivision 5, is in effect a statement that the presumption prevails over any blood tests, then in fact we have a legislative fiat, enacting into existence so to speak a fact which does not exist and cannot be made to exist in actuality.

If such be the situation there is a ready answer to that. As stated in *Heiner* v. *Donnan*, 285 U. S. 312 [52 S.Ct. 358, 76 L.Ed. 772, 781], where the court was speaking of a statute which made a matter conclusive without regard to actualities:

''. . . This court has held more than once that a statute creating a presumption which operates to deny a fair opportunity to rebut it violates the due process clause of the 14th Amendment. . . . 'It is apparent,' . . . 'that a constitutional

prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions.'

"If a legislative body is without power to enact as a rule of evidence a statute denying a litigant the right to prove the facts of his case, certainly the power cannot be made to emerge by putting the enactment in the guise of a rule of substantive law."

In this case we have followed the ruling which denies to the husband the most potent, accurate and competent evidence known to man to insure the ascertainment of the truth; because there is no evidence known to the judicial process which is more lucid and scientifically certain than the blood grouping test when used to negate paternity.

This whole situation is a perfect example of what occurs when truth and justice are not equated. Any law or decision which bypasses, ignores or disregards a manifest truth should be changed forthwith.

We are placing our stamp of approval upon an outdated fiction of the law in the face of and against inexorable scientific facts. I do so reluctantly and because, as a member of an intermediate court, I am constrained to follow the law as it has been stated by the Supreme Court of this state.